**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FUNDAMENTAL INNOVATION SYSTEMS INTERNATIONAL LLC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 21-339-RGA  **FILED UNDER SEAL** |
| ANKER INNOVATIONS LTD. AND FANTASIA TRADING LLC D/B/A ANKERDIRECT, | ) ) ) ) | |
| Defendants. | ) ) | |

---

**PLAINIFF FUNDAMENTAL'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF PATENT ELIGIBILITY AND NO INDEFINITENESS AND MOTION TO EXCLUDE CERTAIN TESTIMONY BY DEFENDANTS' EXPERTS**

Dated:  October 10, 2023

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Jason G. Sheasby (admitted *pro hac vice*)
H. Annita Zhong (admitted *pro hac vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010
Facsimile: (949) 760-5200
jsheasby@irell.com
azhong@irell.com
*Attorneys for Plaintiff*
*FUNDAMENTAL INNOVATION SYSTEMS*
*INTERNATIONAL LLC*

## TABLE OF CONTENTS

**Page**

I.      SUMMARY OF ARGUMENT ........................................................................ 1

II.     NATURE AND STAGE OF THE PROCEEDINGS ...................................... 3

III.    STATEMENT OF FACTS ............................................................................ 4

        A.      Overview of the Technology ............................................................ 4

        B.      Undisputed Material Facts ............................................................... 7

                1.      Claims at Issue ...................................................................... 7

                2.      Patent Eligibility Ruling in TCT Litigation ............................ 10

                3.      Defendants Make the Same Rejected Patent Ineligibility
                        Arguments ............................................................................ 11

IV.     STATEMENT OF LAW............................................................................ 14

        A.      Summary Judgment ....................................................................... 14

        B.      Subject Matter Eligibility............................................................... 15

        C.      Motion to Exclude......................................................................... 16

V.      ARGUMENT ........................................................................................... 16

        A.      The Asserted Claims Are Patent Eligible ....................................... 16

                1.      *Alice* Step 1: The Asserted Claims Are Directed to a
                        Technological Improvement in Charging Technology and Are
                        Therefore Not Abstract ......................................................... 16

                2.      *Alice* Step 2: The Claims Contain an Inventive Concept........ 20

        B.      The Claims of the '550 Patent Are Not Indefinite ........................... 21

        C.      Anker's Technical Experts Should Not Be Permitted to Construe Claim
                Terms ........................................................................................... 24

                1.      Power Requirement.............................................................. 25

                2.      "indicate to the mobile device that the power socket is not a
                        USB host or hub"................................................................ 26

**Page**

3.    "without regard to" and "in response to" does not require active determination by the claimed adapters ('550 patent).............................26

4.    USB Specification...................................................................27

5.    USB specification imposed limit .............................................28

6.    "an identification signal" .......................................................29

D.    The Court Should Exclude Mr. Bakewell's Opinions on Lock-in Value Because the Patents-in-Suit Are Admittedly Not Standards Essential (Paragraphs 71, 174, 177-178, 243, 257, 308)....................................29

E.    The Court Should Exclude Mr. Bakewell's Opinions on Purported Contribution from other USB or Charging Patents to the Value of the Accused Products (*e.g.*, paragraph 324) ..............................................30

F.    The Court Should Preclude Mr. Bakewell from Testifying Regarding the Negotiation History between Fundamental and Anker (Paragraphs 331-342)...............................................................................................31

G.    The Court Should Exclude Mr. Bakewell's Reasonable Royalty Calculation Based on Non-Comparable Licenses (Paragraphs 132-164, 178-182)...............................................................................................32

1.    The Standstill Agreement is Not a Comparable License ........................32

2.    The RPX 4th Amendment, Raised for the First Time in Mr. Bakewell's Rebuttal Report, is Not a Comparable License...................35

H.    The Court Should Exclude Mr. Bakewell's Opinion on Income Approach (Paragraphs 166-171, 178, 201, 254).................................................38

I.    The Court Should Exclude Mr. Bakewell's Opinion on Cost Approach (Paragraphs 174-177, 178).................................................................39

VI.    CONCLUSION.................................................................................39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alcoa, Inc. v. Alcan Rolled Prod.-Ravenswood LLC*,
  2020 WL 433856 (D. Del. Jan. 28, 2020)..............................................................................16

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014)...............................................................................................15, 16, 20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................................14

*Baldwin Graphics Systems, Inc. v. Siebert, Inc.*,
  512 F.3d 1338 (Fed. Cir. 2008)............................................................................................29

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)............................................................................................15

*Biomerieux, S.A. v. Hologic, Inc., C.A. 18-21-LPS*,
  2020 WL 759546 (D. Del. Feb. 7, 2020).........................................................................14, 15

*CAO Lighting, Inc. v. Gen. Elec. Co.*,
  2023 WL 1930354 (D. Del. Jan. 30, 2023)..........................................................................16

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  927 F.3d 1306 (Fed. Cir. 2019)............................................................................................20

*Commonwealth Scientific and Industrial Research Organization v. Cisco Systems, Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015).................................................................................34, 37, 38

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018)............................................................................................15

*DDR Holdings, LLC. v. Hotels.com*,
  773 F.3d 1245 (Fed. Circ. 2014)..........................................................................................20

*Diamond v. Diehr*,
  450 U.S. 175 (1981)..............................................................................................................21

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016).......................................................................................15, 19

*Fundamental Innovation Systems Int'l LLC v. TCT Mobile (US), Inc.*,
  Civil Action No. 20-552-CFC-CJB (D. Del. Feb. 23, 2023)........................................ *passim*

**Page**

*Hanson v. Alphine Valley Ski Area, Inc.*,
 718 F.2d 1075 (Fed. Cir. 1983)...................................................................35, 38

*Kopykake Enters., Inc. v. Lucks Co.*,
 264 F.3d 1377 (Fed. Cir. 2001).........................................................................28

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
 694 F.3d 51 (Fed. Cir. 2012).......................................................................33, 38

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
 30 F.4th 1339 (Fed. Circ. 2022)........................................................................24

*Olympus Corp. v. Maxwell, Ltd.*,
 2018 WL 5962471 (D. Del. Nov. 14, 2018) .....................................................19

*Orexo AB v. Actavis Elizabeth LLC*,
 2019 WL 10060475 (D. Del. Mar. 19, 2019) (C. J. Connolly)..........................30

*PC Connector Solutions LLC v. SmartDisk Corp.*,
 406 F.3d 1359 (Fed. Cir. 2005)..........................................................................28

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
 930 F.3d 1295 (Fed. Cir. 2019)..........................................................................19

*Visual Memory LLC v. NVIDIA Corp.*,
 867 F.3d 1253 (Fed. Circ. 2017)........................................................................19

**Statutes**

35 U.S.C. § 282..........................................................................................................15

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................14

Fed. R. Evid. 408 ......................................................................................................33

Fed. R. Evid. 702 ......................................................................................................16

Plaintiff Fundamental Innovation Systems International LLC ("Fundamental") respectfully moves for summary judgment that the asserted claims are patent eligible, consistent with Chief Judge Connolly's prior finding that "considered in their entirety, the claims of the Fischer patent[s] appear to be directed to specific tangible means for improving mobile device charging technology and therefore I do not think they fail Step 1 of the Alice inquiry …." Ex. 1 [2023-02-21 TCT Hr. Tr.] at 18:10-16.

Fundamental further moves for summary judgement that the asserted claims of the '550 patent are not indefinite for reciting an adapter that is, among other things, "configured to supply current on the VBUS line **without regard to** *at least one associated condition specified in a USB specification"* or "configured to supply current on the VBUS line **without regard to** *at least one USB Specification imposed limit*." *Contra* Ex. 2 [Baker Opening] at ¶ 148 (emphasis in original).

Separately, Fundamental moves to exclude Dr. Min's opinions as related to his improper claim constructions and Mr. Bakewell's opinions as related to "lock-in" value and the resulting improper cost approach analysis, contribution by Anker or third-party patents to the value of the accused products, comparable licenses, the import of Mr. Weinstein's decision not to calculate a reasonable royalty under the income approach, and any attempt to act as a percipient witness regarding the parties' negotiation history.

For reasons stated below, Fundamental respectfully requests that the Court grants its motions.

## I.     SUMMARY OF ARGUMENT

1.     The asserted claims are patent eligible because they are directed to improvement of USB charging technology, as Chief Judge Connolly found in the TCT Litigation. *See* Ex. 1 at 14:3-18:16.

2.      The asserted claims of the '550 patent are not indefinite because "without regard to" does not require inquiry into a designer's subjective intent; and a POSITA can reasonably ascertain whether the disregard of a particular "condition" and "limit" associated with current supply on an accused product's VBUS would result in infringement.

3.      Dr. Min should not be permitted to testify about his erroneous claim constructions that are divorced from the intrinsic evidence. Anker has also never raised these terms during claim construction and should be deemed to have waived its right to have them construed.

4.      Mr. Bakewell should not be permitted to reference or testify about lock-in value or hold-up value because the patents-in-suit are admittedly not standards essential and the testimony will lead to jury confusion and undue prejudice to Fundamental.

5.      Mr. Bakewell should not be permitted to testify to his speculation that the accused products are likely covered by other patents because he is not a technical expert and none of the other technical experts have provided the required foundation for him to conclude as he did.

6.      Mr. Bakewell should not be permitted to testify regarding the negotiation history between Fundamental ████████ because he did not participate in those negotiations and the jury should hear facts from percipient witnesses.

7.      Mr. Bakewell should not be permitted to reference the settlement amount in the ████████████████████████████████ or use the Agreement as a comparable license because the agreement was entered into under unique circumstances absent from a hypothetical negotiation, including ████████████████████████████ ████████████████████████████████ ████████████████████. Untangling the economics of the Agreement would require the jury to evaluate the value of ████████████████ at the time, but it will be very difficult,

- 2 -

if not impossible, to explain the complicated dynamics surrounding the deal without revealing privileged communications or otherwise in a way that will not be severely prejudicial to Fundamental or confusing to a jury.

8.      Mr. Bakewell should not be permitted to rely on  as a comparable license. Through ██████ ████████, Fundamental extended ████████████████████████████████████████████. ████████████████████████████████████ is not a comparable license because Anker ████████ are not similarly situated and ████████████████████████████████ ████████████████. Mr. Bakewell's refusal to properly account for the differences in economic circumstances of the contracting parties renders his analysis unreliable.

9.      Mr. Bakewell should not be permitted to opine that Mr. Weinstein's decision not to adduce evidence under the income approach somehow demonstrates that the patented features are of limited value. Such an opinion is contrary to the law, under which Fundamental can properly rely on comparable-license approach or cost approach for its damages calculation.

10.     Mr. Bakewell should not be permitted to provide his opinions on the cost approach, because the patents-in-suit are not standards essential and the infringing features are incorporated by Anker voluntarily, instead of "due to standardization."  *Contra*, Ex. 19, ¶ 174.

## II.      NATURE AND STAGE OF THE PROCEEDINGS

On March 5, 2021, Fundamental filed a Complaint against the Defendants, asserting that Defendants' USB charging adaptors—such as wall chargers, car chargers, desktop chargers, power strips and power banks—infringe one or more claims of U.S. Patent Nos. 6,936,936 (the "'936 patent"), 7,239,111 (the "'111 patent"), 7,453,233 (the "'233 patent") and 8,624,550 (the "'550 patent") (collectively, the "Patents-in-Suit" or the "Fischer Patents"). Complaint, ¶¶ 2, 22.

On January 5, 2022, Defendants sought to stay the case, pending conclusion of *ex parte* re-

examination and an *inter partes* review proceedings. (D.I. 35). The Court denied the motion. (D.I. 50). On August 26, 2022, Defendants renewed their motion for stay pending *ex parte* reexaminations. (D.I. 62). The Court denied this motion as well on October 20, 2022. (D.I. 79).

The parties filed their joint claim construction brief filed on January 21, 2022 with five terms in dispute. (D.I. 40). The Court ordered the Markman hearing be "CONTINUED to a date to be determined after dispositive motions are filed." (D.I. 51).

On November 14, 2022, the Court entered the parties' stipulation regarding case narrowing. (D.I. 84). On December 23, 2022, Plaintiff narrowed its list of asserted claims; and on March 10, 2023, Defendants narrowed its prior art references and combinations. Ex. 13.

Fact discovery closed on May 16, 2023, expert discovery closed on September 29, 2023, and a final pretrial conference is scheduled for February 26, 2024. (D.I. 119).

## III.   STATEMENT OF FACTS

### A.   Overview of the Technology

The patents-in-suit share a common specification and are generally directed to USB adapters. *See* Ex. 3 ['936], cl. 1; Ex. 4 ['111], cl. 1; Ex. 5 ['233], cl. 1; Ex. 6 ['550], cl. 4. At the time of the invention, USB 2.0 Specification had just been released. Ex. 7 [USB 2.0], cover (released in April 2000). Generally, a USB 2.0 cable includes two conductors—Vbus and Gnd— for delivering power, and two conductors—D+ and D-—for signaling. *Id.* at 17. The four conductors are depicted below in a figure of a USB cable:



**Figure 4-2.  USB Cable**

(Ex. 7 at 17)

The technology claimed in the patents-in-suit was developed by BlackBerry and made it

feasible for power adapters that have no USB enumeration capabilities to provide substantial energy to a mobile device via a USB connector without enumeration. *See* generally Ex. 8 [Fernald Rebuttal], ¶¶ 125-130. Specifically, at the time of the invention (no later than October 2001), a mobile device with a USB interface would use that interface for communicating but "use a separate power interface, such as a barrel connector, for receiving power." Ex. 3 ['936], 1:36-40. Anker's expert, Dr. Min, agrees that was the state of the art as he recalls. Ex. 9 [Min Tr.] at 152:25-153:16. This was despite the fact that "the USB interface c[ould] be used as a power interface" under USB 2.0 Specification (Ex. 7). Ex. 3 ['936], 1:48-50.

The patents-in-suit explain that a separate power interface was needed because "[i]n accordance with the USB specification, typical USB power source devices, such as hubs and hosts, require that a USB device participate in a host-initiated process called enumeration in order to … draw[] power from the USB interface." Ex. 3 ['936], 1:48-55. This requirement for enumeration prevented mobile devices from using the USB interface with "alternate power sources such as conventional AC outlets and DC car sockets that are not capable of participating in enumeration to supply power to the mobile device via a USB interface." *Id.*, 1:50-63.

This is because, although the USB Specification permits a USB device to initially draw 100mA of current, it also requires that a USB device enter into a suspend mode with a 500 μA (0.5mA) current limit if the USB bus is idle for 3 milliseconds or more. Ex. 7 [USB 2.0] at 178, 241; Ex. 8 [Fernald Rebuttal], ¶¶ 117, 879, 884; *cf.*, Ex. 3 ['936], 10:10-14 (referencing "the knowledge that the mobile device will draw energy from a connected device for a period of time before it stops drawing energy due to lack of enumeration"). Hence, when connected to wall chargers or car adapters that could not enumerate or generate any USB bus activity, under the USB specification, a mobile device could draw 100 mA of current for no more than 3 ms. Ex. 8 [Fernald

Rebuttal], ¶¶ 117, 879, 884. That is, without the inventions, USB charging with AC outlets or car sockets would have been impractical. *See* Ex. 8 [Fernald Rebuttal], 46 n.6 (at suspending current, it would take 139 days to charge a 1000mA-Hr battery).

Additionally, even with USB enumeration, the USB 2.0 Specification limits current draw by a mobile device to a relatively low maximum of 500 mA. Ex. 7 [USB 2.0] at 178, Table 7-7. "[B]ecause a USB port cannot force unneeded current into a device, only the requested amount of current would have been supplied to the device from the port." Ex. 8 [Fernald Rebuttal], ¶ 879. This results in an effective current supply limit of 500 mA from a USB power source. *Id.* The inventions not only allow a charger equipped with a USB connector, such as a wall charger and a car charger incapable of participating in USB enumeration, to supply substantial energy through the USB connector without enumeration, but also allow them to supply more current than that is permitted under the USB 2.0 Specification. *E.g.*, Ex. 3 ['936], 8:7-12 ("The USB adapter **100** contributes to a system wherein a device **10** that follows the USB specification when coupled to a typical USB host via its USB port can be informed that the USB adapter **100** has been coupled to the device **10** and that the device **10** can now draw power without regard to the USB specification and the USB specification imposed limits.").

For example, in one preferred embodiment, the inventive USB adapter may include, among other things, an identification subsystem that "provides an identification signal to the mobile device **10** that the power source is not a USB limited source." *Id.*, 8:13-15. The identification signal informs the "mobile device **10** that the device **10** is connected to a power source that is not subject to the power limits imposed by the USB specification." *Id.* at 8:60-65. The identification signal may be "the presence of an abnormal data line condition at the USB port 18." *Id.* at 9:5-9. Because such a signal is not defined as valid in USB 2.0, they can be distinguished from conventional USB

signals, thus allowing the receiving USB device to differentiate between a claimed USB adapter and a convention USB host or hub. *Id.*, 9:16-63. The technical improvements are captured in the claims, such as in the various limitations reciting "an identification subsystem" that provides specified identification signals or in the limitations directed to "abnormal" data conditions on USB data lines, as Chief Judge Connolly previously recognized. *See* Ex. 1 at 15:15-18:16.

### B.   Undisputed Material Facts

#### 1.   Claims at Issue

The patents-in-suit share a common specification and claim priority to the '936 patent as well as two provisional applications filed on March 1, 2001 and October 23, 2001. *See, e.g.*, Ex. 3 ['936], cover; Ex. 4 ['111], cover; Ex. 5 ['233], CoC; Ex. 6 ['550], 1-2.

The claims are entitled to a priority date of at least October 23, 2001. *See* Ex. 2 [Baker Opening], ¶¶ 46, 149.

Pursuant to the parties' stipulation on case narrowing, twenty-four claims currently remain in the case (*see* Ex. 13 at 2):

- Claims 1, 3, 7, 9, 12, 65 and 84 of the '936 patent;

- Claims 1, 6, 8, 12 and 14 of the '111 patent;

- Claims 1, 6, 16, 18 and 21 of the '233 patent; and

- Claims 3, 6, 8, 12, 14, 15 and 16 of the '550 patent.

The asserted claims are directed to USB adapters or methods of using a USB adapter for providing power. *See, e.g.*, Ex. 3 ['936], cls. 1, 65, 84; Ex. 4 ['111], cl. 1; Ex. 5 ['233], cls. 1, 16, 18, 21; Ex. 6 ['550], cls. 3, 6, 12, 14. In particular, claim 1 of the '936 patent recites, *inter alia*,

> 1. A Universal Serial Bus ("USB") adapter for providing a source of power to a mobile device through a USB port, comprising:
>
> a plug unit …;

a power converter …;

a primary USB connector electrically coupled to the power converter for connecting to the mobile device and for delivering the power requirement to the mobile device; and

***an identification subsystem electrically coupled to the primary USB connector for providing an identification signal at one or more data lines of the primary USB connector***;

wherein the identification signal comprises a voltage level that is applied to at least one of the data lines in the primary USB connector, and ***the identification signal comprises a logic high signal on the D+ data line and a logic high signal on the D- data line***.

Ex. 3, cl. 1; *see also id.*, cls. 65 & 84 (reciting "[a] Universal Serial Bus ("USB") adapter for providing a source of power to a mobile device through a USB port, comprising," *inter alia*, "an identification subsystem electrically coupled to the primary USB connector for providing an identification signal at one or more data lines of the primary USB connector, wherein the identification signal comprises a logic high signal on the D+ data line and a logic high signal on the D- data line").

Claim 1 of the '111 patent recites:

 1. A Universal Serial Bus ("USB") adapter for providing power to a mobile device through a USB port, comprising:

a plug unit …;

a power converter …;

***an identification subsystem configured to generate an identification signal, wherein the identification signal is configured to indicate to the mobile device that the power socket is not a USB host or hub***; and

a USB connector coupled to the power converter and the identification subsystem, the USB connector being configured to couple the power output and the identification signal to the mobile device.

Ex. 4, cl. 1.

Claim 1 of the '233 patent recites:

- 8 -

1. A Universal Serial Bus ("USB") adapter for providing power to a mobile device through a USB connector, the USB connector configured to be connectable to a USB-equipped mobile device, comprising:

a plug unit …;

a power converter …;

***an identification subsystem configured to generate an identification signal, the identification signal configured to indicate the USB adapter is configured to send substantial energy through the USB connector before completing device enumeration***; and

wherein the USB connector is coupled to the power converter and the identification subsystem, the USB connector configured to be able to send the power output and the identification signal.

Ex. 5, cl. 1; *see also id.* cl. 18 (reciting a method for using a USB adapter to provide power, including the step of "generating an identification signal configured to allow an indication that the USB adapter is configured to send substantial energy through the USB connector before completing device enumeration" and "wherein the identification signal comprises a voltage level that is applied to the two data lines"), cl. 21 (reciting a method for using a USB adapter to provide power, including the steps of "generating an identification signal configured to allow an indication that the USB adapter is configured to send substantial energy through the USB connector before completing device enumeration" and "providing the identification at the USB connector such that the signal is configured to propagate through a USB connection using two data lines, the signal comprising each of the two data lines being a high state; and providing the power output on a power pin of the USB connector").

Claim 6 of the '550 patent recites:

1. An adapter comprising:

a USB VBUS line and a USB communication path,

said adapter configured to supply current on the VBUS line without regard to at least one associated condition specified in a USB specification.

4. The adapter of claim 1, wherein said current is supplied in response to an abnormal data condition on said USB communication path.

5. The adapter of claim 4, wherein said USB communication path includes a D+ line and a D- line.

6. The adapter of claim 5, wherein said abnormal data conditions is an abnormal data line condition on said D+ line and said D- line.

Ex. 6, cl. 6; *see also id.* cls. 7-8 (requiring the abnormal data line condition to be a logic high signal of greater than 2V on each of the D+ and D- lines); cls. 3 & 12 ("wherein said current is supplied without USB enumeration"), cl. 15 (abnormal condition being "an abnormal data line condition on said D+ line and said D- line"), cl. 16 ("wherein said abnormal data line condition is a logic high signal on each of said D+ and D- lines").

## 2.    Patent Eligibility Ruling in TCT Litigation

In *Fundamental Innovation Systems Int'l LLC v. TCT Mobile (US), Inc. et al.*, Civil Action No. 20-552-CFC-CJB (D. Del.) ("TCT Litigation"), the defendants moved to dismiss the action, arguing that the asserted patents there—including the '936, '111 and '550 patents at issue here— "are directed to the abstract idea of allowing access to an identified power source." Ex. 11 [TCT Litigation, D. I. 22] at 5. After briefing and hearing the defendants' argument, Chief Judge Connolly denied the motion, "conclud[ing] that the Fischer patents are directed to improvement in mobile device charging technology." Ex. 1 [2021-02-23 Hr. Tr.] at 14:3-5.

Not only are the claims 'directed to physical devices," (*id.*, 14:5-20), but "[t]he written description confirm that the patents are directed to physical devices that solve a technical problem." *Id.*, 15:15-17. Chief Judge Connolly observed:

> The patents explain enumeration limited to usefulness of a single USB connection on mobile devices for power and data. The written description explains that "it would be preferable to be able to utilize alternate power sources such as conventional AC outlets and DC car sockets that are not capable of participating in enumeration to supply power to the mobile device via a USB interface."

Ex. 1 at 15:17-16:1 (citing to '550 patent, 2:9-15). Chief Judge Connolly further observed:

> The written description then explains that the claimed invention overcomes this technical limitation by having USB adapters send an identifying signal to the mobile device indicating that it can draw power above the USB specification, ….
>
> ***These improvements appear to be captured in claims***. The '936 and '111 patents require an identification subsystem for providing an identification signal designed to enable the bypass of enumeration, and that can be found at again claim 1 for both patents.
>
> The '550 patent requires the claimed USB adapter to be "configured to supply current on the VBUS line without regard to at least one associated condition specified in a USB specification." Again, that's claim 1 of the '550 patent.
>
> …
>
> ***All of these quoted claim limitations go directly to the technical improvement that the disclosed inventions make to overcome the limitations of USB enumeration***.
>
> I also think that the Federal Circuit's decision in *SRI International* supports a finding of eligibility. In *SRI*, the Federal Circuit explained the claims which override a routine conventional sequence of events are not merely implementing an idea on generic computer technology. The Fischer patents appear to be premised on overriding the ordinary sequence of USB enumeration in order to allow improved charging and thus it cannot be said that they are merely implanting an abstract idea on generic technology. ***The departure from the standard USB implementation illustrates that the invention overcame a technical problem with USB connections.***
>
>  …
>
> I think ***the bottom line is considered in their entirety, the claims of the Fischer patent appear to be directed to specific tangible means for improving mobile device charging technology and therefore I do not think they fail Step 1 of the Alice inquiry*** and there's no need to  consider Alice Step 2, and accordingly I will deny the motion to dismiss.

*Id.* at 16:2-18:16 (emphasis added)

### 3.    Defendants Make the Same Rejected Patent Ineligibility Arguments

The table below compares Dr. Baker's arguments with those raised by the TCT defendants, who hired the same counsel as Defendants here. As is clear, Dr. Baker simply recycled TCT's rejected arguments, sometimes even verbatim:

| Dr. Baker's argument | TCT's argument (citations to original pages) |
|---|---|
| The asserted patents allegedly "are directed to the abstract idea of allowing access to power, particularly, allowing a USB adapter to supply power to a mobile device without complying with requirements of the USB specification." Ex. 2, ¶ 187. | "The asserted claims are directed to the abstract idea of allowing access to an identified power source. …The Fischer Patents allow access to this power source [*e.g.*, wall outlet] by dropping requirements for enumeration and power limits, which were otherwise imposed on USB interfaces by the existing USB specification." Ex. 11 at 1. |
| "[N]othing was changed in an adapter to permit it to supply more power."[1] Ex. 2, ¶ 187. | "The Fischer Patents [allegedly] admit that all recited hardware components were conventional and/or part of the existing USB industry standard (USB 2.0)." Ex. 11 at 1-2. |
| "Claim 1 of the '550 patent recites an adapter that can supply current using two existing wires in an industry-standard USB connector (the 'USB VBUS' and 'USB communication path,' *see* ['550], 7:11-16). The only other limitation is that the adapter supplies current 'without regard' to at least one requirement of the USB specification (*e.g.*, a current limit, claim 2, or enumeration, claim 3). This may be done following a signal that identifies the adapter (such as an 'abnormal data line condition," claim 4, which Fundamental proposes to be construed as nothing more than a 'condition on the USB communication path that is not defined as a valid USB data condition'). *Id.*, Fig. 3, 9:8-47. The remaining claims of the '550 patent recite different options for what constitutes the identification signal, which the specification teaches can be 'a single voltage on one or more of the USB data lines, different voltages on the two data lines, a series of pulses or voltage level changes, or other types of electrical signals.' *Id.*, 8:29-33." Ex. 2, ¶ 190. | "Claims 1 and 10 of the '550 patent recite a charging adapter with a conventional USB connector, which used the existing VBUS line to supply power and existing communication paths (D+ and D- lines) to send data. *See* ['550] at 7:9-16; FAC ¶54. The only additional limitation is that the adapter supplies current 'without regard' to at least one requirement of the USB specification (e.g., without a current limit, claims 2, 9, 11 and 18, or without enumeration, claims 3 and 12). This may be done after the adapter provides an identification signal (e.g., an "abnormal data line condition," claims 4 and 13). *Id.* at Fig. 3, 9:8-47; FAC ¶55. The remaining claims 5-8 and 14-17 recite different options for the identification signal, which can be 'a single voltage on one or more of the USB data lines, different voltages on the two data lines, a series of pulses or voltage level changes, or other types of electrical signals.' *Id.* at 8:29-33." Ex. 11 at 4-5. |

---

[1] This is incorrect: the novel, non-conventional, non-routine and not well-understood identification subsystem and identification signals called out by Chief Judge Connolly are the changes added to the USB adapter to enable practical USB charging with power from wall or car sockets. Ex. 1 at 16:2-19.

| | |
|---|---|
| Claim 1 of the '111 patent is directed to the same USB adapter as the '550 patent, but it recites conventional hardware within the adapter (such as a 'plug unit' and a 'power converter') and includes generating an identification signal so the mobile device knows the adapter is not a USB host and can connect without enumeration. ['111], 11:60-12:8." Ex. 2, ¶ 190. | "Claim 1 of the '111 patent …is directed to the same USB adapter as the '550 patent, but recites conventional hardware within the adapter, including an industry-standard USB port, and includes an identification signal so the mobile device knows the adapter is not a USB host and can connect without enumeration: [claim elements]. [¶] '111 Patent at 11:60-12:8 …" Ex. 11 at 7. |
| "Claim 1 of the '550 patent recites as its main concept to 'supply current … without regard to at least one associated condition specified in a USB specification.' The claim uses an industry standard USB connector, with two existing wires (a 'VBUS line' and 'communication path'), and… simply allows access to an existing power resource *by not enforcing one or more conditions* specified by the existing USB standard. The result is that a mobile device with a standard USB port can immediately access power resources when it is connected to the standard USB port of a USB adapter." Ex. 2, ¶ 191. | "[I]n representative claim 1 of the '550 patent …, the core concept is to 'supply current' …"without regard to at least one associated condition specified in a USB specification.' The claims use an industry standard USB connector, with two existing wires (a 'VBUS line' and 'communication path'), and simply *allow access* to an existing power resource *by not enforcing one or more conditions* specified by the existing USB standard. The result is that a mobile device with an existing USB port can access power when it is connected to the USB port of a USB adapter." Ex. 11 at 10-11. |
| "The Asserted Patents recite generating an identification signal, which serves no other purpose than to tell a connected device that it is connected to a charger. Yet, this is simply a voltage level and not any improvement to an adapter or a device. As explained elsewhere in this report, it is a routine output of a well-known adapter that existed long before the Asserted Patents. The Asserted Patents merely attempted to claim a new use for a voltage signal, which is quite routine and done all the time in the field." Ex. 2, ¶ 191. | "The representative claims of the '111... and '936 patents further recite an identification signal that allows a mobile device to know it is connected to a USB adapter as opposed to a USB host. This aspect of the claims is part of the same abstract idea of allowing access to power resources, as it involves nothing more than the identifying the type of power resource being accessed (a USB adapter rather than a USB host) so the mobile device knows that it can immediately access power without first satisfying certain conditions." Ex. 11 at 11-12.<br><br>"The patents disclose that the 'identification signal' is nothing more than a voltage level on one of the existing USB data lines." Ex. 12 [101 Mtn. Reply] at 3. |
| "None of the individual components in the Asserted Patent claims add anything unconventional or non-routine." Ex. 2, ¶ 193 | "Similarly, representative claim 1 of the '111 patent …recite[s] generic components of a USB adapter 'configured to' perform their |

| | |
|---|---|
| (listing as conventional "plug unit," "power converter").<br><br>"I further note that the combination of these elements, as well as elements in all of the claims, does not add anything more than their standard and routine combination according to their intended uses." *Id.* | conventional functions, *e.g.,* a 'plug unit' to receive energy from a power socket, a 'power converter' to regulate received energy from the socket to power output, ...." Ex. 11 at 16-17.<br><br>"For example, even assuming that a USB interface had not previously been combined with a power charger, Fundamental points to nothing claimed that constitutes a technological innovation that enabled these two conventional components to be combined in an adapter. Nor does Fundamental identify a claimed technological innovation that would allow a USB adapter to send a voltage over a data line to identify itself." Ex. 12 [101 Mtn. Reply] at 10-11. |
| "And even the identification signal, which is nothing more than a voltage level, 'could be the communication of a single voltage on one or more of the USB data lines, different voltages on the two lines ... or other types of electrical signals.' ['111], 8:25-29." Ex. 2, ¶ 193 | "The patents disclose that the 'identification signal' is nothing more than a voltage level on one of the existing USB data lines. '187 patent at 8:27-33." Ex. 12 [101 Mtn. Reply] at 3. |

## IV.    STATEMENT OF LAW

### A.    Summary Judgment

Summary judgment should be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is genuinely disputed only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the burden of demonstrating the absence of a genuine issue of material fact." *Biomerieux, S.A. v. Hologic, Inc., C.A. 18-21-LPS*, 2020 WL 759546, at *3 (D. Del. Feb. 7, 2020). "If the moving party has carried its burden, the nonmovant must then 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). "To defeat a motion for summary judgment, the nonmoving party must "'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id*.

> ### B.    Subject Matter Eligibility

"Whether a claim recites patent eligible subject matter is a question of law which may contain disputes over underlying facts. Patent eligibility has in many cases been resolved on motions to dismiss or summary judgment." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018)

A party asserting invalidity under Section 101 bears the burden of establishing invalidity by clear and convincing evidence. *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1364 (Fed. Cir. 2018) (citing 35 U.S.C. § 282). A challenger must first demonstrate that the claims as a whole are "abstract" and "directed to a patent-ineligible concept." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014). "[T]he first step of the inquiry is a meaningful one ... and it ... cannot simply ask whether the claims involve a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions involves a law of nature and/or natural phenomenon ...." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012)).

If the challenger satisfies the first step, the Court must then proceed to step two, which requires "examin[ing] the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 1357. In the context of computer related technology, a claim recites an inventive concept "when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer*, 881 F.3d at 1367.

C.      Motion to Exclude

"Federal Rule of Evidence 702 creates 'a gatekeeping role for the [trial] judge' in order to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *CAO Lighting, Inc. v. Gen. Elec. Co.*, 2023 WL 1930354, at *1 (D. Del. Jan. 30, 2023) (quoting *Daubert*, 509 U.S. at 597). "This analysis requires that the court make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology . . . can be [properly] applied to the facts in issue.'" *Alcoa, Inc. v. Alcan Rolled Prod.-Ravenswood LLC*, 2020 WL 433856, at *2 (D. Del. Jan. 28, 2020).

V.      ARGUMENT

A.      The Asserted Claims Are Patent Eligible

1.      *Alice* Step 1: The Asserted Claims Are Directed to a Technological Improvement in Charging Technology and Are Therefore Not Abstract

The claims of the patents-in-suit are not directed to abstract ideas, but instead to improvements in USB charging technology. Specifically, the claims are directed to USB adapters that can charge a USB device in an unconventional way, without invoking the standard USB enumeration process. *See*, Ex. 3 ['936], 1:50-63.

For instance, the specification notes that although a standard USB interface could be used for both power and data, "the USB [was] typically not used for that purpose [as a power interface] by mobile devices." Ex. 3 ['936], 1:48-50. That is because a mobile device needed to participate in a host-initiated process called enumeration to be able to draw substantial energy from a USB interface. *Id.*, 1:50-57. Without USB enumeration, conventionally, a mobile device would "draw energy from a connected [USB connector] for a period of time before it stops drawing energy due to lack of enumeration." *Id.*, 10:10-14. This is because, USB specifications at the time require that

a mobile device to "enter suspend mode and only draw 500μA if the [USB] bus is idle for 3msec or more [.]"  Ex. 8 [Fernald Rebuttal], ¶ 117. "A current of 500μA is insufficient for the practical operation of a charger circuit." *Id.*

Yet, "it would be preferable in many situations, such as when a [USB] host would not be available, as often happens during normal use of a mobile device, to be able to utilize alternate power source such as conventional AC outlets and DC car sockets that are not capable of participating in enumeration to support power to the mobile device via a USB interface." Ex. 3 ['936], 1:55-63. Hence, the specification explains in detail the limitation of conventional and standard USB technology in that it limited the power sources from which a USB device may be charged. For example, as explained by the specification, with the then standard and conventional USB technology, a USB mobile device could only be charged when connected to a USB host such as a computer, but not when they were connected to the more common and convenient "alternate power sources such as conventional AC outlets and DC car sockets." Ex. 3 ['936], 1:55-63.

The solution offered by the patents-in-suit overcame this limitation by inventing a USB adapter that provides an identification signal to indicate to a mobile device that the adapter is not a USB hub or host, *e.g.*, "the power source is not a USB limited source" and the device can "draw power without regard to the USB specification and the USB specification imposed limit." *Id.*, 8:7-15. "The identification signal could be the communication of a single voltage on one or more of the USB data lines, different voltages on the two data lines, a series of pulses or voltage level changes, or other types of electrical signals." *Id.*, 8:15-19. For instance, the identification signal can "result[] from the application of voltage signals greater than 2 volts to both the D+ and D- lines in the USB connector." *Id.*, 9:11-13. Such a signal could, for example, lead to "the presence of an abnormal data line condition at the USB port" of a mobile device that could be detected by

the mobile device. *Id.*, 9:6-9.

These improvements are captured in the asserted claims of the asserted patents, such as

- "an identification subsystem electrically coupled to the primary USB connector for providing an identification signal at one or more data lines of the primary USB connector," "wherein the identification signal comprises a logic high signal on the D+ data line and a logic high signal on the D- data line" (Ex. 3 ['936], claims 1, 65, 84);

- "an identification subsystem configured to generate an identification signal, wherein the identification signal is configured to indicate to the mobile device that the power socket is not a USB host or hub" (Ex. 4 ['111], claim 1 and dependent claims);

- "an identification subsystem configured to generate an identification signal, the identification signal configured to indicate the USB adapter is configured to send substantial energy through the USB connector before completing device enumeration" (Ex. 5 ['233], claim 1 and dependent claims");

- "generating an identification signal configured to allow an indication that the USB adapter is configured to send substantial energy through the USB connector before completing device enumeration," "wherein the identification signal comprises a voltage level that is applied to the two data lines" (Ex. 5 ['233], claims 15-16 and 18),

- "generating an identification signal configured to indicate the USB adapter is configured to send substantial energy through the USB connector before completing device enumeration," "providing the identification signal at the USB connector such that the signal is configured to propagate through a USB connection using two data lines, the signal comprising each of the two data lines being a high state; and providing the power output on a power pin of the USB connector" (Ex. 5 ['233], claim 21); and

- "said adapter configured to supply current on the VBUS line without regard to at least one associated condition specified in a USB specification" (or "without regarding to at least one USB Specification imposed limit"), "wherein said current is supplied without USB enumeration" (Ex. 6 ['550], claims 3 and 12) or "wherein said current is supplied in response to an abnormal data condition on said USB communication path" (Ex. 6 ['550], claims 4 and 13 and dependent claims).

Under the Federal Circuit precedent, claims are patent-eligible when they are "rooted in computer technology in order to solve a specific problem in the realm of computer[s]." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303 (Fed. Cir. 2019) (citing *DDR Holdings, LLC. v. Hotels.com*, 773 F.3d 1245, 1257 (Fed. Circ. 2014)). In *SRI*, the Federal Circuit affirmed that claims were patent eligible because they were directed to "an improvement in computer network technology" and solved "weakness in conventional networks." *Id.*

Similarly here, the patents specifically identify a technical problem and solve it. The resulting claims are thus patent eligible. *See*, *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) (claims not directed to an abstract idea in light of "the specification's disparagement of conventional data structures, combined with language describing the … self-reference table" that provided "a specific improvement to the way computers operate"); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259-60 (Fed. Circ. 2017) (claims for an enhanced computer memory system not directed to an abstract idea because they were "directed to a technological improvement" with "[t]he specification explain[ing] that multiple benefits flow from the improved memory system"); *Olympus Corp. v. Maxwell, Ltd.*, 2018 WL 5962471, at *6 (D. Del. Nov. 14, 2018) (claims directed to an improved camera that "modif[ies] power consumption … depending on the mode of operation" not abstract). Consequently, because the claims are

- 19 -

directed to specific technological improvement, they are patent eligible.

Defendants' expert report does not advance any new arguments that could overcome Chief Judge Connolly's previous fact findings. Contrary to Dr. Baker's assertion, the asserted claims are not "directed to the abstract idea of allowing access to power [.]" *Contra* Ex. 2, ¶ 187. They are directed to a specific improvement of battery charging technology as explained above. Indeed, as Dr. Baker acknowledges, the claims "allow[] a USB adapter to supply power to a mobile device without complying with requirements of the USB specification." *Id.* As Chief Judge Connolly previously observed, by being "premised on overriding the ordinary sequence of USB enumeration in order to allow improved charging," "it cannot be said that [the Fischer patents] are merely implanting an abstract idea on generic technology." Ex. 1 [2021-02-23 Hr. Tr.], 17:19-23. Rather, "[t]he departure from the standard USB implementation illustrates that the invention overcame a technical problem with USB connections." *Id.*, 17:24-18:1.

### 2.   *Alice* Step 2: The Claims Contain an Inventive Concept

Fundamental submits that because the claims satisfy *Alice* Step 1 inquiry, there is no need to analyze further under *Alice* Step 2. But if an inquiry is conducted, the only reasonable conclusion is that the claimed adapters supply power using USB in an unconventional manner by departing from the standard USB technology of the day. *See* Section III.A (explaining how the patents' technology differs from standard USB technology). Like the claims in *DDR*, which "overr[o]de the routine and conventional sequence of events," the claims here allowed for overriding the routine and conventional sequence of USB charging, by allowing for sustained charging without the enumeration step. *Cf.*, Ex. 1, 17:19-18:1.

Defendants argue that the claims are merely combining conventional components (*see* Ex. 2 [Baker Opening], ¶¶ 191-193), but conventional components can be combined in an inventive manner. For instance, in *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (Fed. Cir. 2019),

- 20 -

the Federal Circuit rejected the argument that replacing a USB cable with Bluetooth was non-inventive, because even if Bluetooth was conventional at the time of the invention, implementing Bluetooth with particular devices in a specific combination was inventive.

Similarly, it is inventive to apply a conventional technique in a new application that led to technological improvement. Thus, in *Diamond v. Diehr*, 450 U.S. 175, 192-193, (1981), the Supreme Court held that "when a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect (e.g., transforming or reducing an article to a different state or thing), then the claim satisfies the requirements of § 101." Here, even if an identification signal is not by itself patentable, a claim satisfies the requirement of § 101when the claim implements or applies that signal in a structure or process which, when considered as a whole, is transforming a power adapter to a different thing, one in which conventional restrictions on USB charging is overcome.

For reasons stated above, the asserted claims are patent eligible.

## B.     The Claims of the '550 Patent Are Not Indefinite

Defendants and their expert, Dr. Baker, contend that the scope of the terms "without regard to at least one associated condition specified in a USB specification" and "without regard to at least one USB Specification imposed limit" is not reasonably certain and the associated claims are therefore invalid for indefiniteness. Ex. 2 [Baker Opening], ¶¶ 148-150. Defendants did not seek construction of these terms, agreeing instead that "USB Specification/USB specification" should be accorded their plain meaning in light of the construction of "USB," which is "Universal Serial Bus as described in Universal Serial Bus Specification Revision 2.0 and related versions of this standard at the time of the claimed invention." D.I. 27 at 3, 10.

The Court in the Eastern District of Texas previously considered and rejected a similar

indefiniteness argument. Ex. 14 [Samsung Markman Order] at 37-38; Ex. 15 [Samsung CC Br.] at 11-13. There, the Samsung defendants argued that because USB 2.0 specifies multiple current limits, "at least one of these limits is *always* disregarded in USB 2.0 …" and the terms are thus indefinite. Ex. 15 at 12. Here, too, Dr. Baker argues that the terms are indefinite at least in part because "it is not reasonably certain which limits or conditions are being referred to in the context of the claim language," pointing to the multiple current limits as evidence of uncertainty. Ex. 2 [Baker Opening], ¶ 152.

But as Dr. Fernald explains, the terms are not indefinite "because a POSITA would have understood that the specified limits are for specific conditions." Ex. 8 [Fernald], ¶ 883. That is, "[a] POSITA would consider the state the device is in and then determine whether it is in violation of the limits associated with the device in that state." *Id.*, ¶ 884. Infringement can therefore be reasonably ascertained. "For example, the USB Specification Revision 2.0 notes the following limits for a low power device: 100 mA after enumeration, 100 mA before enumeration; 500 µA in the suspended state." *Id*. A POSITA would understand "that the 500µA limit … is not a limit when the [low-power] device is in an active … state. When a low power device is in an active state either before or after enumeration, the limit is 100 mA and this is what a POSITA would look toward." *Id.*, ¶ 884. In other words, a POSITA would know which of the multiple limits would apply given the type of device and the state of operation.[2]

Additional arguments by Dr. Baker also fail.

<u>Compliance with Later USB Standards or non-USB Standards:</u>  Dr. Baker argues that the claims are indefinite because allegedly an adapter would be found infringing by complying with

---

[2] The context of the claim also makes clear that the conditions or limits that are to be disregarded are ones related to current supply on the VBUS, and not any or all USB limitations. *See* Ex. 16 [IPR2018-00111 FWD] at 8-12.

later USB standards or non-USB standards, even though the adapter is also allegedly compliant with USB Specifications existing at the time of the invention. Ex. 2 [Baker Opening], ¶ 150 (*e.g.*, "if a mobile device drew current in a manner consistent with a condition or limit in USB 2.0 or earlier, it would be doing so 'without regard to' USB 2.0 or earlier, if it is designed to comply with any later USB standard or any non-USB standard or if it is designed without reference to any standard at all"). That argument is incorrect. Fundamental has never taken the position that infringement follows automatically from compliance with a later USB standard or a non-USB standard. As is clear from the plain language of the claims, infringement is not determined with reference to later USB specifications or non-USB standards, but with reference to "USB Specification"/"USB specification" as construed. There is no uncertainty there.

$\quad$ <u>Subjective Intent of Designer:</u> Dr. Baker next argues that the claims are indefinite because he could not ascertain "the intention of the designer" and thus could not determine whether the adapter falls within or outside the claim scope. Ex. 2, ¶ 151. Nothing in the specification or the claims associates "without regard to" to a designer's subjective intent. Instead, "without regard to" examines the structure, function and operation of the adapter. For instance, the specification teaches that the inventive USB adapter "contributes to a system wherein a device **10** that follows the USB specification when coupled to a typical USB host via its USB port can be informed that the USB adapter **100** has been coupled to the device **10** and that the device **10** can now draw power without regard to the USB specification and the USB specification imposed limits." Ex. 3 ['936], 8:7-12. Nothing in this disclosure suggests that the device needs to ascertain a designer's intent before it can draw power "without regard to" limits imposed by the USB specification. This argument by Dr. Baker therefore fails.

$\quad$ <u>Different versions of USB Specifications existing at the time of the invention may conflict</u>

- 23 -

<u>with one another:</u> Dr. Baker then argues that the claims are uncertain because the term "USB Specification" encompasses more than one version of the USB specifications in existence at the time of the invention such that the adapter may be supplying current in compliance with one version but in violation of another. Ex. 2, ¶¶ 153, 156. This argument fails for multiple reasons. First, there is no evidence that the different versions of USB specifications existing at the time of the invention impose different limits or conditions for current supply on the VBUS line; in fact, they have the same relevant limits. Ex. 8 [Fernald Rebuttal], ¶¶ 888-889. Second, the claims recite "without regard to at least one" USB current supply limit or condition. Thus, so long as the adapter's current supply on the VBUS is in violation of one applicable limit/condition in one version of USB specification as construed, infringement follows. A finding of infringement does not require the adapter be disregarding the applicable limit or condition in all USB specifications, if the current-supply requirements in different versions varied (and they did not).

In short, what Defendants are really complaining about is the breadth of the claims, not the alleged uncertainty in the claim scope. But "a claim is not indefinite just because it is broad." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Circ. 2022). Thus, for reasons stated, the Court should find that the claims of the '550 patent are not indefinite.

## C.    Anker's Technical Experts Should Not Be Permitted to Construe Claim Terms

The parties have completed their claim construction briefing. Defendants do not argue that additional terms need to be construed, but their non-infringement expert, Dr. Min, has advanced idiosyncratic interpretation for many of the claim terms. His interpretation is divorced from the patent specification; and to the extent that Defendants adopt his interpretation, the underlying claim construction positions are waived because Defendants did not seek to have those terms

construed.[3]

### 1.     Power Requirement

Claim 1 of the '936 patent recite, among other things, "a power converter … being operable to regulate [a] received energy from the power socket and to output a power requirement to the mobile device." '936, claim 1; *see also*, claims 65, 84 (also reciting "power requirement"). Dr. Min asserts that a "power requirement to the mobile device" needs to be a specified value of power required by the mobile device. Ex. 17 [Min], ¶¶ 95-96. In the context of his analysis, Dr. Min implicitly construes the term as requiring that the power converter have some kind of internal logic to determine a specific quantity of power that the mobile device needs. *Id.* This is contrary to what the patent teaches. For example, the specification provides:

> [W]hen a USB adapter **100** is coupled to the mobile device **10** and has been
> identified as a USB adapter **100**, the mobile device **10** can forego the enumeration
> process and data negotiation process and immediately draw energy from the
> USB power adapter **100** at a desired rate, for instance at 5 unit loads, i.e., 500 mA.

Ex. 3 ['936], 9:50-55. A POSITA would understand from the disclosure that the adapter, by providing the identification signal, allows the mobile device to assess how much current the USB adapter can provide and to draw the current accordingly. Ex. 8 [Fernald Rebuttal], ¶ 879 ("A POSITA would also have understood that because a USB port cannot force unneeded current into a device, only the requested amount of current [by a USB device] would have been supplied to the device from the port."); *see also* Ex. 17 [Min], ¶ 252 (asserting "it is the mobile device that dictates what amount of energy can be drawn from the Accused Products"). Given the disclosure and the knowledge of a POSITA, a POSITA would understand that the patent does not contemplate a

---

[3] Fundamental also disagrees with Dr. Min's interpretation of the five disputed terms, but understand that the Court will resolve the dispute and Dr. Min's opinions inconsistent with the Court's claim construction will be excluded. Fundamental also disagrees with how Dr. Min applies agreed-to constructions, such as "USB communication path."

power converter that is actively determining how much power a mobile device would need. Dr. Min's claim construction, contrary to the explicit disclosure of the patent and knowledge of a POSITA, is not helpful to the jury and should be excluded.

### 2.      "indicate to the mobile device that the power socket is not a USB host or hub"

Dr. Min appears of the view that this claim term requires the identification signal to indicate to the mobile device that "a power socket is involved." Ex. 17, ¶¶ 171-172. That is incorrect. The specification teaches how an identification subsystem provides an identification signal that indicates that a power source such as USB adapter is not a USB limited source (*i.e.*, not a USB host or hub). *See* Ex. 5 ['111], 8:17-42. And as the court in the Eastern District of Texas recognized, "the written description uses the phrase 'power *source*' to encompass USB 'hubs and hosts' as well as 'alternate power *sources* such as conventional *AC outlets* and DC car *sockets*." Ex. 14 at 50 (emphasis in original). Thus, a POSITA would understand from the patent's disclosure that for an identification signal to "indicate to the mobile device that the power socket is not a USB host or hub," it just requires that the identification signal indicate to the mobile device that the power source (*e.g.*, the power socket coupled with the USB adapter) is not a conventional USB host or hub.

### 3.      "without regard to" and "in response to" does not require active determination by the claimed adapters ('550 patent)

Dr. Min's non-infringement argument indicates that he implicitly construes "without regard to" as requiring the adapters to "determine how much current to supply." Ex. 17 [Min], ¶ 208. As noted above, the specification of the patents-in-suit does not require the adapter to be actively determining how much current to supply the mobile device. Instead, the adapter provides the identification signal to allow the mobile device to determine whether it is connected to a USB adapter or a conventional USB host/hub, and to then draw current accordingly. Ex. 3 ['936], 9:50-

55. The adapter supplies the amount of current, power and energy drawn by the mobile device. Ex. 8 [Fernald Rebuttal], ¶ 879 ("A POSITA would also have understood that because a USB port cannot force unneeded current into a device, only the requested amount of current [by a USB device] would have been supplied to the device from the port."). Hence, Dr. Min's claim interpretation is divorced from both the intrinsic evidence and basic engineering, and he should not be permitted to testify to such erroneous claim interpretation.

For the same reason, limitations that recite "wherein said current is supplied in response to an abnormal data condition on said USB communication path" ((Ex. 6 ['550], claims 4 and 13) also do not require the adapter to make a determination; it merely requires the adapter to supply the current in response to the abnormal data condition on the USB communication path. This can happen, as in the preferred embodiment of the specification, with the mobile device detecting the abnormal data condition and drawing an amount of current in excess of that permitted under the USB specification. Ex. 3 ['936], 9:50-55. The adapter supplies the amount of current drawn by the mobile device accordingly.

### 4.    USB Specification

Dr. Min acknowledges that the terms "USB Specification" and "USB specification" are to be accorded their plain meaning in light of the construction of "USB." Ex. 17 [Min] at ¶¶ 35-36. "USB" in turn is construed as "Universal Serial Bus as described in Universal Serial Bus Specification Revision 2.0 and related versions of this standard at the time of the claimed invention." *Id.* The time of the invention was no later than October 2001. *Id.*, ¶ 30. Dr. Min asserts, however, Battery Charging 1.2 Specification, published in 2012, should be considered part of USB 2.0 Specification at the time of the claimed invention (October 2001). *Id.*, ¶ 203 (Dr. Min disagreeing that "Battery Charging Specification 1.2 ('BC 1.2') is not part of the USB 2.0 standard"). This opinion is unreliable and wrong as a matter of law. Dr. Min should not be

permitted to testify that Battery Charging Specification 1.2 is part of USB 2.0, and mislead the jury into believing that it is part of the claimed USB Specification, because BC 1.2 was not adopted until more than a decade after the inventions and cannot be part of "USB" under the parties' agreed to construction. *See*, *e.g.*, *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) ("meaning must be interpreted as of [the] effective filing date"); *Kopykake Enters., Inc. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001) ("[W]hen a claim term understood to have a narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean at the time of filing.") (citation omitted); *see also generally*, Ex.14 at 13-21.

### 5.  USB specification imposed limit

Dr. Min argues that there is no infringement under the '550 patent "because none of the Accused Products are defined under the USB 2.0 Specification []," and thus the current limits defined by the USB 2.0 Specification are "'not imposed' on the Accused Products." Ex.17 [Min], ¶ 229. Requiring the claimed adapter be subject to a "USB specification imposed limit" as Dr. Min opines is wrong as a matter of law because the plain language requires the exact opposite, that the claimed adapter be configured to supply a current on the VBUS "without regard to at least one USB Specification imposed limit." Ex. 6 ['550], claim 10. The patent teaches that the claimed adapter is not an adapter compliant with USB 2.0 Specifications:

> [The inventive] adapter 100 contributes to a system wherein a device 10 that follows the USB specification when coupled to a typical USB host via its USB port can be informed that the USB adapter 100 has been coupled to the device 10 and that the device 10 can now draw power ***without regard to the USB specification and the USB specification imposed limits***. The identification subsystem 108 provides an identification signal to the mobile device 10 that ***the power source is not a USB limited source.***

Ex. 3 ['936], 8:7-12 (emphasis added). As Chief Judge Connolly recognized, the inventions are to "depart[] from the standard USB implementation." Ex. 1, 17:19-18:1. Thus, "USB specification

imposed limit" cannot be interpreted to require that the recited "USB specification imposed limit" be a limit imposed on the adapter, as opposed to a limit that would apply to a conventional USB host or hub. Dr. Min may not testify to such erroneous claim interpretations.

### 6. "an identification signal"

The parties have agreed that "identification signal" means "signal that identifies a power source type." Ex. 17, ¶ 36. Dr. Min attempts to further limit it to a "single signal." *Id.* at ¶ 102 ("the identification signal is a single signal, whether it is provided at one data pin or two data pins"). In the patent parlance, "a" or "an" means "one or more." *Baldwin Graphics Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) ("That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention."). Limiting the identification signal to a single signal is therefore not justified under the patent law. The interpretation is also inconsistent with the specification, which expressly teaches that the identification signal can be more than one signal: for example, it can include "different voltages on the two data lines, a series of pulses or voltage level changes …." Ex. 3 [936], 8:15-19. Dr. Min's claim interpretation, being contrary to the patent law and the teachings of the specification, is unreliable and unhelpful to the jury, and should be excluded.

### D. The Court Should Exclude Mr. Bakewell's Opinions on Lock-in Value Because the Patents-in-Suit Are Admittedly Not Standards Essential (Paragraphs 71, 174, 177-178, 243, 257, 308)

Neither side argues that the Asserted Claims are standards essential. Defendants' damages expert, Mr. Bakewell, also does not contend that any of the patents in Fundamental's portfolio are standards essential. Ex. 18, 59:20-24 ("Q: Are you contending any of the patents in Fundamental's portfolio are standard essential? A. No.").

Yet, in multiple places, Mr. Bakewell's report addresses the purported need to "separate[] the value of the standard from the underlying patent right …." Ex. 19 [Bakewell], ¶ 202; *see also*

*id.*, ¶¶ 71, 174, 243, 257. Separately, in paragraphs 177, 178 and 308, Mr. Bakewell comments more generally regarding the need to "valu[e] a patent right on an *ex ante* basis," instead of "the value of lock in, or disruption." *Id.*, ¶ 177; *id.*, ¶ 308 (criticizing Mr. Weinstein's approach as "incorporat[ing] the impact of lock-in…by considering the after-the-fact"). The "lock-in" value espoused by Mr. Bakewell here is just another name for "hold-up" value.

In *Orexo AB v. Actavis Elizabeth LLC*, 2019 WL 10060475, at *2 (D. Del. Mar. 19, 2019) (C. J. Connolly), Chief Judge Connolly excluded the "hold-up" opinion by the defendants' damages expert under *Daubert*. In that case, the defendants did not have a non-infringing alternative ready at the time of the hypothetical negotiation (same as here), and the damages expert considered that the time it would take for the defendants to design an alternative as "excludable 'hold-up' value because, he says, Defendants were 'locked into' using Plaintiffs' patent." *Id.* Chief Judge Connolly explained that "hold-up" value is specific to standards setting context, and does not apply when "there is no standard setting authority that requires Defendants to infringe." *Id.* Same here, there are no standards setting organizations that require Anker to infringe, and it is inappropriate for Mr. Bakewell to testify to such concepts that would confuse the jury and have no basis in the patent law.

The Court should therefore exclude Mr. Bakewell from testifying regarding (1) standards essentiality; and (2) any opinions regarding "lock-in" or "hold-up" values.

### E.    The Court Should Exclude Mr. Bakewell's Opinions on Purported Contribution from other USB or Charging Patents to the Value of the Accused Products (*e.g.*, paragraph 324)

There is no basis for Mr. Bakewell to testify that other patents, such as unspecified allegedly USB standards essential patents or unspecified charging technology patents, cover the accused products or have contributed to the value of the accused products. *See*, *e.g.*, Ex. 18 [Bakewell Tr.], 186:16-187:8); Ex. 19, ¶ 324. First, Mr. Bakewell himself is not a technical expert.

Ex. 18, 56:20-22 ("Q: So you are not a technical expert? A. True."). As such, he lacks the technical expertise to even determine whether any patents cover the accused products.

Second, Anker's technical experts have not identified any third-party or Anker patents that the accused products practice. Ex. 9 [Min Tr.], 154:8-18 ("Q: Have you identified any Anker patent that is practiced by the accused products in this case? A. No, I—I have not seen any patents from Anker. Q: Okay. Have you identified any third-party patents that are practiced by the accused products in this case? A. I have not done any analysis of such."); Ex. 10 [Baker Tr.], 16:16-17:5 ("Q: Have you performed any analysis to determine whether any of Anker's accused products are covered by any Anker patents? A. I wasn't asked to do that, and I don't recall doing it. Q: Have you performed any analysis to determine whether Anker's accused products are covered by any third-party patents?  A. That's not something I was asked to do nor do I think it's –this question or the previous are relevant to my report on the validity of the asserted patents.") (objections omitted). There is thus no factual foundation for Mr. Bakewell to opine or suggest that the accused products are covered by other USB patents or "hundreds of patents related to battery charging speed technologies."   *Contra*, Ex. 19, ¶ 324; Ex. 18, 186:16-187:8.

As a result, the Court should preclude Mr. Bakewell from offering any testimony or suggesting that there are other patents that can allegedly cover the accused products and contribute to the value of the accused products.

### F.   The Court Should Preclude Mr. Bakewell from Testifying Regarding the Negotiation History between Fundamental ███████ (Paragraphs 331-342)

Mr. Bakewell includes in his report a section on ███████ negotiation history. Ex. 19 [Bakewell], ¶¶ 331-342. Mr. Bakewell has no personal knowledge of any of the events that took place, and may not serve as a mouthpiece to testify to such facts. While experts may base their opinions on hearsay, they should not be permitted to testify to matters that are normally in the

province of a fact witness. The jury should hear facts from percipient witnesses.

**G.    The Court Should Exclude Mr. Bakewell's Reasonable Royalty Calculation Based on Non-Comparable Licenses (Paragraphs 132-164, 178-182)**

Mr. Bakewell based his reasonable royalty calculation on two agreements: ████████

████████████████████████████████████████ Ex. 21); and (2) ████████

███████████████████████████████████████████████████████████████████

██████████████████████████████ Exs. 22-23). Ex. 19, ¶ 178. Neither

qualifies as a comparable license agreement, and Mr. Bakewell should not be permitted to present

them as such.

**1.    ████████████████████████████████████**

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

---

███████████████████████████████████████████████████████████████████

██████████████████████████████████████



██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████

**2.** ████████████████████ **Raised for the First Time in Mr. Bakewell's Rebuttal Report, is Not a Comparable License**

Mr. Bakewell's opinion is excludable for two separate reasons. First, ████████ ████████ was not identified in Anker's interrogatory responses to Fundamental's Interrogatory No. 14 that asked Anker to identify "any license agreements that [Anker] contend[s] may be relevant to the calculation of damages." Ex. 25 at 13-15; Ex. 19 [Bakewell], ¶ 134, n. 208 (Bates range not among the information identified in discovery responses). It should therefore be excluded on procedural grounds because Anker's withholding of the relevant information during fact discovery deprived Fundamental of the opportunity to conduct, *e.g.*, third-party discovery from ████████ related to ████████████████████.

Second, the license agreement is not comparable given how differently ████ and Anker are situated. In particular, ████████████████████████████ ████████████ Fundamental entered into ████████████████████ ████████████. Ex. 22 ████████████]. In addition to ████████████ ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████ Ex. 22 at FUND00002510,

§ 1.2(a); Ex. 19 [Bakewell], ¶ 132. ████████████████████████████ and

Anker is not one of them. Ex. 22 at FUND00002521-22, 2552-59. ████████████████

███████████████████████████████████████████

Ex. 26 [1/5/2022 Seaman] at 202:20-202:24; *see also* Ex. 22 at FUND00002552-59 (the agreed to

███████████████████████████████████████████

████████████████████████████████).

  ██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████. Ex. 23 [█████████████] at FUND00042278.███

███████████████████████████████████████████

███████████████████████████████. *Id.* Mr. Bakewell's royalty calculation relies

in part on this amount. Ex. 19, ¶ 178.

  Mr. Bakewell does not state that █████████████ is technically comparable,

opining instead that "[b]ecause it ██████████████ it is relevant from a technical

standpoint," but is allegedly "████████████████████████████████████████

████████████████████ *Id.*, ¶ 138. Mr. Bakewell bases the alleged economic

comparability on (1) ████████████ status to Anker, and (2) the timing of the license. *Id.*,

¶ 139. Mr. Bakewell asserts that the amount paid █████████████████████████

███████████████████████████████████████████

████████████████████" *Id.*, ¶ 160.

Mr. Bakewell fails to properly account for the "differences in … economic circumstances of the contracting parties," that is, the differences in economic circumstances in a transaction involving Anker and Fundamental versus one involving Fundamental ██████. *CSIRO*, 809 F.3d at 1303. Those two transactions differ significantly. For a license agreement between Anker and Fundamental, it is ██████████; whereas, as Mr. Bakewell testified, "███████████████ █████████████████████████████████████████████████████████████████s." Ex. 18, 260:22-25; *see also*, Ex. 22 at FUND00002521-22, 2552-59 (████████████████████ ██████). In other words, the consideration that Fundamental receives ██████████████ ████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████. Mr. Bakewell fails to consider the value to Fundamental for ████████████████████████████████████.[5]

Thus, the amount that Fundamental was willing to accept ██████████ does not reflect the amount of reasonable royalty that it would be willing to accept in a hypothetical negotiation with Anker, because Anker ██████████████████████████████████████████████████████ ██████████. Mr. Bakewell does not properly account for this difference or the value of the ██████████████ to Fundamental. There is also no evidence that ██████████████ ████████████████████████████████████████████████; indeed, not even the Bakewell report claims that ██████████████████████████████████████████████ ██████████████████████. Ex. 19, ¶¶ 132-164; Ex. 22 at FUND00002521-22; Exs. 28-29.

Additionally, ██████████████████████████████████████████████. Ex. 19 [Bakewell], ¶ 140 (Mr. Bakewell acknowledging ██████████████████████

___
[5] Because Defendants fail to reveal their reliance ██████████████████████████ ██████t, Fundamental also did not have a chance to conduct discovery to understand the license terms between ██████████.

████ ). In *LaserDynamics*, the Federal Circuit observed that "[t]he propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable." 694 F.3d at 77. The questionability of the settlement amount is compounded by Mr. Bakewell's refusal to account for factors such as cost of litigation when calculating the damages amount. Ex. 19 at ¶ 232. The Federal Circuit has pointed out, however, "license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation" and "should not be considered evidence of an established royalty." *Hanson*, 718 F.2d at 1078-79, *accord LaserDynamics*, 694 F.3d at 77.

The evidence therefore demonstrates that ████████████████ did not arise under sufficiently comparable circumstances as the hypothetical negotiation between Fundamental and Anker. The Court should therefore exclude Mr. Bakewell's reasonable royalty analysis based on ████████████████ .

### H.   The Court Should Exclude Mr. Bakewell's Opinion on Income Approach (Paragraphs 166-171, 178, 201, 254)

Mr. Weinstein did not use an income approach when assessing the damages for which Fundamental is entitled for Anker's infringement. Mr. Bakewell did not arrive at a quantitative number under the income approach either. *See* Ex. 19, ¶¶ 166-171, 178. Mr. Bakwell argues, however, Mr. Weinstein's decision not to proceed under the income approach and not to present evidence related to increased sales is evidence that the patented features had limited values. *Id.*, ¶ 168-172. That is wrong as a matter of law. Mr. Weinstein need not assess the damages number under all common approaches, and he can use only the comparable license approach and the cost approach. Mr. Bakewell's suggestion to the contrary is inconsistent with the Federal Circuit law that expressly approves the use of comparable licenses as reliable means for calculating a reasonable royalty. *See*, *e.g.*, *CSIRO*, 809 F.3d at 1303-04 ("comparable license valuations … at

- 38 -

least in some cases … may be the most effective method of estimating the asserted patent's value"). As a result, Mr. Bakewell should not be allowed to opine that the absence of evidence under the income approach somehow indicated that the patented technology is of "limited value."

> **I.  The Court Should Exclude Mr. Bakewell's Opinion on Cost Approach (Paragraphs 174-177, 178)**

Mr. Bakewell claims that the cost approach is unreliable allegedly "due to standardization." Ex. 19 at ¶ 174. But as made clear by the patent specification and as Chief Judge Connolly previously found, the inventions deviate from the USB Specification. *See* Ex. 1, 17:19-18:1. In fact, Dr. Min's suggestion that the infringing features can be removed from the accused products by using USB PD alone in the charger indicates that the accused BC 1.2 charging mode is but an optional feature. Ex. 19, ¶ 206. Moreover, no reasonable fact finder would regard the accused Apple Divider charging mode as the result of "standardization." Consequently, Mr. Bakewell's opinions on cost approach is unreliable and should be excluded.

## VI.  CONCLUSION

For reasons stated above, Fundamental respectfully requests that the Court find:

1. The asserted claims are patent eligible; and

2. The asserted claims of the '550 patent are not indefinite.

Fundamental also respectfully requests that the Court exclude the following testimony by Anker's experts:

| Expert | Testimony Topics | Exemplary Paragraphs |
|---|---|---|
| Dr. Min | claim construction for "power requirements | Ex. 17, ¶¶ 95-96 |
| | claim construction for "wherein the identification signal is configured to indicate to the mobile device that the power socket is not a USB host or hub" | Ex. 17, ¶¶ 171-172 |

- 39 -

| | claim construction of "without regard to" | Ex. 17, ¶¶ 201, 208 |
|---|---|---|
| | that specifications adopted long after the invention date could be part of "USB Specification"/ "USB specification" | Ex. 17, ¶¶ 203-207 |
| | claim construction for "USB specification imposed limit" | Ex. 17, ¶ 229 |
| | claim construction for "identification signal" | Ex. 17, ¶ 102 |
| Mr. Bakewell | standards essentiality and lock-in value | Ex. 19, ¶¶ 71, 174, 177, 243, 257, 308 |
| | contribution of value by Anker or third-party patents to the accused products | Ex. 19, ¶ 324 |
| | the parties' negotiation history | Ex. 19, ¶¶ 331-342 |
| | use of ██████████████ as a comparable license and disclosure of settlement amount | Ex. 19, ¶¶ 115-131 |
| | use of ██ ████████ ████████ as a comparable license | Ex. 19, ¶¶ 132-164 |
| | income approach, in particular, his opinion that Mr. Weinstein's decision not to proceed under income approach somehow shows that the patented features has limited values | Ex. 19, ¶¶ 166-171 |
| | cost approach | Ex. 19, ¶¶ 174-177 |
| | And Ex. 19, ¶¶ 178-182 corresponding to the above topics. | |

Dated: October 10, 2023              Respectfully submitted,

                                      FARNAN LLP

                                By:  */s/ Michael J. Farnan*
                                    Brian E. Farnan (Bar No. 4089)
                                    Michael J. Farnan (Bar No. 5165)
                                    919 N. Market Street, 12th Floor
                                    Wilmington, Delaware 19801
                                    Telephone:  (302) 777-0300
                                    Facsimile:   (302) 777-0301
                                    bfarnan@farnanlaw.com
                                    mfarnan@farnanlaw.com

                                    Of Counsel:
                                    Jason G. Sheasby (admitted *pro hac vice*)
                                    H. Annita Zhong (admitted *pro hac vice*)
                                    IRELL & MANELLA LLP
                                    1800 Avenue of the Stars, Suite 900
                                    Los Angeles, CA 90067
                                    Telephone: (310) 277-1010
                                    Facsimile: (949) 760-5200
                                    jsheasby@irell.com
                                    azhong@irell.com

                                    *Attorneys for Plaintiff*
                                    *FUNDAMENTAL INNOVATION SYSTEMS*
                                    *INTERNATIONAL LLC*