IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FUNDAMENTAL INNOVATION
SYSTEMS INTERNATIONAL LLC,

    Plaintiff,

v.

ANKER INNOVATIONS LTD. and
FANTASIA TRADING LLC d/b/a
ANKERDIRECT,

    Defendants.

Civil Action No. 21-339-RGA

MEMORANDUM OPINION

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE; Hong Annita Zhong, Jason G. Sheasby, IRELL & MANELLA LLP, Los Angeles, CA,

    Attorneys for Plaintiff.

John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Michael C. Chow, ORRICK, HERRINGTON & SUTCLIFFE LLP, Irvine, CA; Yufeng (Ethan) Ma, ORRICK, HERRINGTON & SUTCLIFFE LLP, Chicago, IL; Robert J. Benson, BAKER BOTTS, San Francisco, CA; Jeffery L. Johnson, BAKER BOTTS, Houston, TX,

    Attorneys for Defendants.

December 19, 2024

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me are the issues of claim construction of multiple terms in U.S. Patent Nos. 6,936,936 (the "'936 patent), 7,239,111 (the "'111 patent"), 8,624,550 (the "'550 patent"), and 7,453,233 (the "'233 patent").[1] The parties submitted a Joint Claim Construction Brief (D.I. 40), and I heard oral argument on November 20, 2024.[2]

## I. BACKGROUND

Plaintiff Fundamental Innovation Systems International filed this suit against Defendants Anker Innovations Ltd. and Fantasia Trading LLC (together, "Anker") on March 5, 2021, alleging infringement of four of its patents. (D.I. 1). The patents share a common specification and are generally directed to techniques using Universal Serial Bus ("USB") for data communication and charging mobile devices. (D.I. 40 at 1 n.1; D.I. 1 at 3). The parties dispute the construction of five terms across the asserted patents. (D.I. 40, 212, 213).

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (alteration in

---

[1] In the briefing, there is discussion of four additional patents: U.S. Patent Nos. 7,834,586, 8,232,766, 7,986,127, and 8,169,187. (D.I. 40). Those four patents were asserted against another defendant, Lenovo, which joined Fundamental and Anker in filing the joint claim construction brief. (Docket No. 20-551, D.I. 1 at 1). Fundamental and Lenovo stipulated to dismissal, which I granted on July 28, 2022. (Docket No. 20-551, D.I. 190). Those patents are not asserted against Anker. I will thus not discuss them.

[2] Citations to the transcript of the argument, docketed at D.I. 244, are in the format "Tr. at __."

2

original) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted). "While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1323).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony,

3

dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (quoting *Markman*, 52 F.3d at 980). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

## III. CONSTRUCTION OF AGREED-UPON TERMS

I adopt the following agreed-upon constructions:

| Claim Term | Claims | Construction |
|---|---|---|
| USB / Universal Serial Bus ("USB") | '111 patent, claims 1, 6, 8, 12, 14<br><br>'550 patent, claims 1, 3–8, 10, 12–16<br><br>'936 patent, claims 1–3, 7, 9, 12, 65, 84<br><br>'233 patent, claims 1, 6, 16, 18, 21 | Universal Serial Bus as described in Universal Serial Bus Specification Revision 2.0 and related versions of this standard at the time of the claimed invention. |
| USB-equipped mobile device | '233 patent, claims 1, 21 | Plain meaning in light of the construction of "USB" |
| identification signal | '111 patent, claims 1, 6, 8, 12, 14<br><br>'936 patent, claims 1, 3, 7, 9, 12, 65, 84<br><br>'233 patent, claims 1, 6, 16, 18, 21 | Signal that identifies a power source type |
| an invalid USB data condition / invalid USB state | '233 patent, claim 15 | Condition that is not defined as a valid USB data condition |
| USB connector | '936 patent, claims 1, 65, 84<br><br>'111 patent, claims 1, 6, 8, 12, 14<br><br>'233 patent, claims 1, 6, 15 | Plain meaning in light of the construction of "USB" |

| USB port | '936 patent, claims 1, 65, 84<br><br>'111 patent, claims 1, 6, 8, 12, 14 | Plain meaning in light of the construction of "USB" |
|---|---|---|
| USB host or hub / USB hub or host | '111 patent, claim 1 | Plain meaning in light of the construction of "USB" |
| USB controller | '111 patent, claim 8 | Plain meaning in light of the construction of "USB" |
| USB enumeration / enumeration | '550 patent, claims 3, 12<br><br>'233 patent, claims 1, 21 | Plain meaning in light of the construction of "USB" |
| USB communication path | '550 patent, claims 1, 3–8, 10, 12–16 | Plain meaning in light of the construction of "USB" |
| USB specification / USB specification | '550 patent, claims 1, 3–8, 10, 12–16 | Plain meaning in light of the construction of "USB" |

## IV. CONSTRUCTION OF DISPUTED TERMS

The parties dispute five terms across the claims. The representative claims state:

1. *A **Universal Serial Bus ("USB") adapter*** for providing power to a mobile device through a USB port, comprising:
a plug unit configured to receive energy from a power socket;
a power converter coupled to the plug unit, the power converter being configured to regulate the received energy from the power socket to ***generate*** a power output;
an identification subsystem configured to ***generate*** an identification signal, wherein the identification signal is configured to indicate to the mobile device that the power socket is not a USB host or hub; and
a USB connector coupled to the power converter and the identification subsystem, the USB connector being configured to couple the power output and the identification signal to the mobile device.

('111 patent at 11:60–12:8) (disputed terms bolded and italicized).

1. A ***Universal Serial Bus ("USB") adapter*** for providing a source of power to a mobile device through a USB port, comprising:
a plug unit for coupling to a power socket and for receiving energy from the power socket;
a power converter electrically coupled to the plug unit, the power converter being operable to regulate the received energy from the power socket and to output a ***power requirement*** to the mobile device;
a primary USB connector electrically coupled to the power converter for connecting to the mobile device and for delivering the ***power requirement*** to the mobile device; and

5

> an identification subsystem electrically coupled to the primary USB connector for providing an identification signal at one or more data lines of the primary USB connector;
> wherein the identification signal comprises a voltage level that is applied to at least one of the data lines in the primary USB connector, and the identification signal comprises a logic high signal on the D+ data line and a logic high signal on the D− data line.

('936 patent at 11:47–12:2) (disputed terms bolded and italicized).

> 1. *A Universal Serial Bus ("USB") adapter* for providing power through a USB connector, the USB connector configured to be connectable to a USB-equipped mobile device, comprising:
> a plug unit configured to receive energy from a power socket;
> a power converter coupled to the plug unit, the power converter being configured to regulate the received energy from the power socket to generate a power output;
> an identification subsystem configured to generate an identification signal, the identification signal configured to indicate the *USB adapter* is configured to send substantial energy through the USB connector before completing device enumeration; and
> where the USB connector is coupled to the power converter and the identification subsystem, the USB connector configured to be able to send the power output and the identification signal.

('233 patent at 11:36–54) (disputed terms bolded and italicized).

> 1. An adapter comprising:
> a *USB VBUS line* and a USB communication path,
> said adapter configured to supply current on the *VBUS line* without regard to at least one associated condition specified in a USB specification.
>
> 4. The adapter of claim 1, wherein said current is supplied in response to an *abnormal data condition on said USB communication path*.
>
> 5. The adapter of claim 4, wherein said USB communication path includes a D+ line and a D− line.
>
> 6. The adapter of claim 5, wherein said *abnormal data condition* is an *abnormal data line condition on said D+ line and said D− line*.

('550 patent at 12:7–12, 12:17–23) (disputed terms bolded and italicized).

6

1. **"universal serial bus adapter" / "universal serial bus ('USB') adapter" / "USB adapter" ('111 patent, claims 1, 6, 8, 12, and 14; '936 patent, claims 1–3, 7, 9, 12, 65, and 84; '233 patent, claims 1, 6, 15, 16, 18, and 21)[3]**

   a. *Plaintiff's proposed construction*: preamble not limiting; power supply configured to supply power from a power source to a USB device.
   b. *Defendants' proposed construction*: preamble limiting; USB power supply configured to supply power from a power source to a USB device (in accordance with the construction of "USB").
   c. *Court's construction*: power supply configured to supply power from a power source to a USB device.

The parties have two disputes over "universal serial bus adapter," "universal serial bus ('USB') adapter," and "USB adapter."[4]

The parties first disagree about whether the preamble of a claim with "USB adapter" is limiting. Fundamental argues the preamble is not limiting, except when the preamble provides antecedent basis.[5] (D.I. 40 at 8). Anker argues a preamble with "USB adapter" is always limiting, regardless of whether the preamble provides antecedent basis. (*Id.* at 12). The parties conceded at oral argument that if I adopt Fundamental's construction for the term, the limiting preamble issue is unimportant. (Tr. 14:4–12, 20:9–16). For the reasons below, I adopt Fundamental's construction and will thus not decide whether the preamble is limiting.

The parties agree that the claimed USB adapter supplies power from a power source to a USB device. (D.I. 40 at 8–9). They disagree about whether that power source is a "USB" power supply within the meaning of the USB Specification Revision 2.0 ("USB 2.0").[6] (*Id.* at 9).

---

[3] More claims are listed in the joint claim construction brief than are listed here. (*See* D.I. 40 at vii). The parties stipulated to reducing the number of asserted claims. (D.I. 125 at 7). The claims listed in this opinion reflect that stipulation.
[4] The parties argue their constructions of these three terms together. Ostensibly, they mean the same thing. I will refer to all three as "USB adapter."
[5] Fundamental concedes that the preamble is limiting in the following claims due to the preamble providing antecedent basis: '111 patent, claim 17; '936 patent, claims 51, 55, 63, 99, and 101; and '233 patent, claims 1 and 15. (D.I. 40 at vii).
[6] USB 2.0 is a revised USB specification that was released in April 2000. (D.I. 1 at 4). It provides standards and specifications to be used with USB technology. (*Id.*). It is prior art to the

Fundamental argues the power supply should not be so restricted because the novelty of its invention is that the power supply includes capabilities outside the scope of USB 2.0. (*Id.*). Anker argues that the power supply should be so restricted because "USB adapter" contains the word "USB," which has an agreed-upon meaning and should not be ignored. (*Id.* at 17–18). Anker does not dispute that part of the novelty of Fundamental's invention is capability outside that defined in USB 2.0, but argues at least part of the claimed adapter is compliant with USB 2.0. (Tr. 25:10–14; D.I. 40 at 18). Anker argues that Fundamental's claims should be read as compliant with USB 2.0 until they indicate they are not; thus, the claimed "USB" adapter should be restricted to USB 2.0 unless the claim language later indicates a deviation from USB 2.0. (Tr. 25:16–26:15).

I agree with Fundamental's construction. I do not think that Fundamental attempts to write "USB" out of its claims as alleged by Anker. (D.I. 40 at 18). The invention is a "USB" adapter because it can power a USB device and contains a USB connector, not because it is compliant with USB 2.0. (Tr. 6:1–7, 31:11–15; '111 patent at 11:60–12:8). Indeed, the novelty of Fundamental's claimed invention is that the adapter is not compliant with USB 2.0. (*See* '550 patent at 3:2–10). Adopting Anker's construction would read the novelty out of the claims. Considering the patent specification is the most important guide in construing a disputed term, *Phillips*, 415 F.3d at 1315, the specification's repeated assertion that the patented invention deviates from USB 2.0 should be used to construe "USB adapter" as a power supply configured to supply power to a USB device, not as a USB power supply in accordance with USB 2.0.

---

asserted patents. (Tr. 8:7–10). The patents assert to build on, or improve upon, the capabilities described in USB 2.0. (Tr. 25:16–20; D.I. 1 at 4).

8

Anker argues that the claimed invention deviating from USB 2.0 supports its proposed construction because the claimed USB adapter maintains some features of USB 2.0. (D.I. 40 at 18). Anker argues a reference back to USB 2.0 is necessary to provide context for the invention or else any type of power supply, such as a "dumb" barrel connector, would satisfy the term. (*Id.*; Tr. 23:15–19). I do not think that is the case. There are further limitations in the claims that indicate when the patented invention complies with USB 2.0. For example, claim 1 of the '111 patent includes a "USB connector." ('111 patent at 11:60–12:8). The parties agree a "USB connector" is construed as "plain meaning in light of the construction of 'USB'" and "USB" is "Universal Serial Bus as described in [USB 2.0]." (D.I. 27 at 3, 6). When the claim is later limited by a USB connector within the scope of USB 2.0, there is no danger that any power supply, such as a "dumb" barrel connector, will satisfy the claimed invention. (Tr. 23:15–19, 30:22–31:10).

In the joint brief, Fundamental argues that the term at issue contains the word "USB" because it is configured to power a USB device. (D.I. 40 at 26). In the brief, Anker argues that it is the "USB connector" that appears later in the claims that makes the adapter a "USB" adapter, not its ability to provide power to a USB device. (*Id.* at 32). At oral argument, Fundamental seemed to argue Anker's point supports its own position. Fundamental argued:

> And as to why it's called USB, if you showed it to a jury, they will know why it's called a USB. You have this USB connector. You -- that's where the USB cable goes. And it goes to the USB connector of your phone. That's why it's called a USB.

(Tr. 31:11–15). I take it that Fundamental argues it is both the capability to power a USB device and the claimed USB connector that renders the invention a "USB" adapter. Anker did not address this USB connector argument at oral argument. I think the point supports Fundamental's position. As already explained, the adapter is innovative because it is not compliant with USB

9

2.0. And, as Fundamental explained, some parts of the claimed invention are compliant with USB 2.0, such as the USB connector. (Tr. 36:19–23). Calling the adapter a "USB" adapter refers at least in part to the USB connector, which itself is limited to a connector compliant with USB 2.0. (D.I. 27 at 3, 6). There is no reason to further restrict the inventive USB adapter to the confines of USB 2.0 when it necessarily operates outside of USB 2.0 except when otherwise claimed, like with the USB connector.

Anker thinks the inverse is true. Anker argues that the claims should be read as compliant with USB 2.0 until they say otherwise. (Tr. 25:10–26:15). Anker points to no support in the patent specification for this argument. (Tr. 29:25–30:12). Indeed, though the specification makes numerous references to USB 2.0, it repeatedly represents that the claimed invention deviates from USB 2.0. (*See* '550 patent at 3:2–10). These representations support Fundamental's argument that the claimed invention is not compliant with USB 2.0 unless it indicates otherwise. I see no reason to restrict the USB adapter to USB 2.0 when it is clear from the specification that the innovation of the claimed invention is non-compliance with USB 2.0.

For at least these reasons, I adopt Fundamental's construction of "universal serial bus adapter," "universal serial bus ('USB') adapter," and "USB adapter."

2. **"USB VBUS line" ('550 patent, claims 1, 3–6, 10, and 12–15)**

   a. *Plaintiff's proposed construction*: plain meaning in light of the construction of "USB."
   b. *Defendants' proposed construction*: power line in a USB connector (in accordance with the construction of "USB").
   c. *Court's construction*: plain meaning in light of the construction of "USB."

Fundamental argues that "USB VBUS line" should be given its plain meaning in light of "USB." (D.I. 40 at 41). Fundamental points to various agreed-upon constructions that contain the word "USB" where the parties agree those terms are given their plain and ordinary meanings in light of the construction of "USB." (*Id.*). Anker argues that "USB VBUS line" should be

10

construed as a power line in a USB connector, pointing to examples in the specification and arguing that the invention would not work if the USB VBUS line were not in the connector. (*Id.* at 45, 57–58; Tr. 43:13–14). Anker argues that all the examples in the specification show the VBUS line in a USB connector. (D.I. 40 at 46; Tr. 43:3–10). Fundamental does not seem to dispute this, but points to the '021 provisional application that contains examples of the USB VBUS line outside the USB connector. (D.I. 40 at 42). Anker argues the provisional application does not help Fundamental because the '021 provisional application cannot be used to contradict the specification, which shows the USB VBUS line in the USB connector in every example. (*Id.* at 49–50, 55). Fundamental argues the USB VBUS line should not be confined to a USB connector because the claims do not recite the line being in a USB connector. (*Id.* at 51; Tr. 45:14–16).

I agree with Fundamental. The claims do not recite a USB VBUS line in a USB connector; they recite a USB VBUS line with no indication of where it is. Even if all the example embodiments in the specification show the USB VBUS in a USB connector, that itself is not enough to import the limitation into the claims when the claims do not recite a USB VBUS line in a USB connector. *See Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358–59 (Fed. Cir. 2016). The Federal Circuit has held, "[I]t is not enough that the only embodiments, or all of the embodiments, contain a particular limitation to limit claims beyond their plain meaning." *Id.* at 1359 (internal quotation marks and citation omitted). The claims should not be construed beyond their plain meaning.

As noted by Anker and discussed at oral argument, it may be the case that the USB VBUS line must be in the USB connector for the invention to work. (D.I. 40 at 57; Tr. 43:13–14). I think that is a fact issue, not a claim construction issue. (*See* Tr. 44:6–7, 44:19–24).

11

"[C]ourts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Claims are construed as written. *Id.* A limitation in the specification should not be read into claims that do not recite the limitation. *Deere & Co.*, 703 F.3d at 1354. Anker is free to offer expert testimony on where a POSA would think a USB VBUS line would have to be in the claimed invention for it to work. Anker acknowledged this at oral argument. (Tr. 44:19–24).

I reject Anker's proposed construction that the USB VBUS line must be in the USB connector. I adopt Fundamental's proposed construction of plain meaning in light of the construction of "USB."

3. **"abnormal data line condition on said D+ line and said D- line" / "abnormal data condition on said USB communication path" ('550 patent, claims 4–6 and 13–15)**

   a. *Plaintiff's proposed construction*: condition on the D+ line and D- line that is not defined as a valid USB data condition / condition on the USB communication path that is not defined as a valid USB data condition.
   b. *Defendants' proposed construction*: condition on the D+ line and D- line that is not defined as a valid data condition / condition on the USB communication path that is not defined as a valid data condition.
   c. *Court's construction*: condition on the D+ line and D- line that is not defined as a valid USB data condition / condition on the USB communication path that is not defined as a valid USB data condition.

Fundamental argues that an "abnormal data condition" on a USB communication path and an "abnormal data line condition" on a D+ line and D- line[7] should be construed as a condition not defined as a valid USB data condition. (D.I. 40 at 58). Anker argues that an abnormal condition is one that is not defined as valid. (*Id.* at 61). In other words, Fundamental argues an abnormal data condition occurs when the condition is not defined as valid according to USB standards, while Anker argues an abnormal condition occurs when the condition is not defined as valid, period.

---

[7] In my discussion, I refer to both of these terms as an "abnormal data condition."

12

Anker's primary argument relies on the parties' agreement that other similar terms have the same construction that Fundamental now proposes. (*Id.*). For example, the parties agree that an "invalid USB data condition" means a "condition that is not defined as a valid USB data condition." (D.I. 27 at 6). Anker argues that the disputed term should not be given the same construction as a non-disputed term. (D.I. 40 at 61). Fundamental argues that, read in light of the specification, it is clear that the "abnormal data condition" in the disputed term is "abnormal" compared to typical USB conditions, even if that means multiple phrases yield the same construction. (*Id.* at 62–63).

I agree with Fundamental. I think that an "abnormal data condition" means a condition not defined as a valid USB data condition. Claim construction begins with the claim language itself. *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1218 (Fed. Cir. 2020). The claims here acknowledge that the abnormal data condition refers to abnormal USB data conditions. For example, claim 4 of the '550 patent recites "an abnormal data condition on said USB communication path." ('550 patent at 12:16–18). The abnormal condition is on the USB communication path; it naturally follows that the abnormal data condition is one that is not defined as a valid USB data condition.

This construction is further supported by the specification. The specification discloses an embodiment where an abnormal data condition is received at a USB port so a mobile device can draw power without limitations imposed by USB 2.0. (*Id.* at 9:8–24). For a mobile device to draw power from the USB adapter without USB 2.0 restrictions by way of an abnormal data condition, it follows that the condition must be an abnormal USB condition. (*See id.*).

Anker points to no support in the specification that the abnormal data condition is anything other than an abnormal USB data condition. Anker simply argues that I should not read

13

a word into the claim language that is not there. (D.I. 40 at 61–62). But that is not what I am doing. In reading the claims in light of the entire claim language and the specification, as required by law, *Phillips*, 415 F.3d at 1315, it is clear that the "abnormal" data condition is with respect to typical USB data conditions. This is not importing limitations from the specification into the claim language. This is clarifying what the claim language means in light of the specification.

That Fundamental's construction is the same as the parties' agreed-upon construction for a differently worded term does not render it incorrect. The Federal Circuit has recognized that claim drafters can use multiple different phrases to mean the same thing. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). I think that is the case here.

I reject Anker's proposed construction and adopt Fundamental's construction that an "abnormal data line condition on said D+ line and said D- line" and an "abnormal data condition on said USB communication path" is a condition that is not defined as a valid USB data condition.

### 4. "generate" / "generating" ('111 patent, claims 1, 6, 8, 12, and 14)

    a. *Plaintiff's proposed construction*: provide/providing.
    b. *Defendants' proposed construction*: plain meaning, which is to bring into existence; produce/producing.
    c. *Court's construction*: produce/producing.

At oral argument, I ruled on the construction of "generate/generating." (Tr. 68:17–20). For the reasons stated on the record, I adopt part of Anker's construction; namely, that "generate/generating" means "produce/producing." (*Id.*). Fundamental argues that I should adopt its construction because another judge in a related case has adopted its currently proposed construction. (D.I. 40 at 66). I have considered the other judge's interpretation and reasoning,

14

but for the reasons stated on the record at the Markman hearing, I adopt Anker's construction of "produce/producing."

### 5. "power requirement" ('936 patent, claims 1, 9, 65, and 84)

    a. *Plaintiff's proposed construction*: plain meaning, which is power outputted and delivered from the USB adapter to a mobile device via a USB connector, in a form and an amount [usable] by the mobile device.
    b. *Defendants' proposed construction*: plain meaning, which is a power requirement of the mobile device.
    c. *Court's construction*: amount of power demanded by the mobile device.

Both sides argue that "power requirement" should be given its plain and ordinary meaning, but they disagree on what that plain and ordinary meaning is. Fundamental argues it is power outputted from the USB adapter to a mobile device in an amount useable by the mobile device, while Anker argues it is a power requirement from the mobile device. (D.I. 212 at 1; D.I. 213 at 1). Fundamental argues the term cannot mean the USB adapter performs logic to determine how much power to output to the mobile device. (D.I. 212 at 1). Anker asserted in its letter that it was not arguing such a logic in its construction, and asserted at oral argument that the adapter must know how much power to output to the mobile device. (D.I. 213 at 1; Tr. 79:10–24, 87:25–88:5).

I find neither parties' proposed constructions compelling. Fundamental's proposed construction reads the word "requirement" out of "power requirement." Anker's proposed construction may not require the adapter to execute logic to determine how much power to output, but at a minimum requires the adapter to know how much power the mobile device needs with no indication of how the adapter gains this information. Neither of these constructions capture what is supported by the plain language of "power requirement" and the specification: a power requirement demanded by the mobile device.

15

The specification repeatedly refers to a power requirement as power outputted to a mobile device. (*See* '550 patent at 2:19–48). The determination of how much power is outputted, or the "requirement," must come from somewhere. (*See* Tr. 76:19–22). Though Anker repeatedly asserts the adapter must know how much power is required of the mobile device, Anker points to no support for this in the specification. Indeed, Fundamental emphatically asserts that the adapter has no logic to determine how much power to output to a mobile device. (D.I. 212 at 1). Anker does not seem to dispute this, but still maintains that the USB adapter must otherwise know how much power to output. (D.I. 213 at 1; Tr. 77:4–5). At oral argument, Fundamental argued the specification shows that the power is determined by what a mobile device demands and eventually argued that "power requirement" means power demanded by a mobile device. (Tr. 80:12–16). I take it that Fundamental has no issue with my construction. (*See* Tr. 90:12–91:10; 91:20–25).

Anker seems to still think that "amount of power demanded by the mobile device" reads the "requirement" out of "power requirement." (Tr. 85:15–86:19). Anker argues that the adapter need not make a determination with how much power to provide, but that it must know how much power to output before it starts doing so. (Tr. 87:17–24). Fundamental argues that the adapter need not know how much power the mobile device demands. (Tr. 82:20–21).

I do not think that my construction is all that different from what Anker seeks. Anker wants to avoid a construction where the limitation is satisfied when any amount of power is sent from the adapter to the mobile device. (Tr. 87:10–88:5). My construction avoids such an outcome. "Amount of power demanded by the mobile device" will not be satisfied by any amount of power sent from the adapter to the mobile device. It will be satisfied when the adapter sends the amount of power demanded by the mobile device. This is not so different from

16

Anker's proposed construction of "power requirement of the mobile device." Indeed, Anker submitted at oral argument that the "power requirement has to come from the mobile phone." (Tr. 77:4–5).

Anker also seeks a construction where the adapter knows how much power the mobile device needs. (Tr. 75:1–8). Fundamental argues the adapter need not know how much power the mobile device will draw; the adapter merely reacts to signals from the mobile device. (Tr. 82:20–25). I find no support for Anker's argument in the specification. Indeed, the specification recites that, once the USB adapter is coupled to a mobile device, "the device can now draw power." ('550 patent at 8:21–26). This tends to support Fundamental's argument that the adapter reacts to a demand from a mobile device. There is no indication in the specification that the adapter must know how much power the mobile device demands.

I reject both parties' proposed constructions and adopt the construction "amount of power demanded by the mobile device."

## V. CONCLUSION

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion.