**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

FUNDAMENTAL INNOVATION SYSTEMS INTERNATIONAL LLC,

Plaintiff,

v.

ANKER INNOVATIONS LTD. and FANTASIA TRADING LLC d/b/a ANKERDIRECT,

Defendants.

Civil Action No. 21-339-RGA

MEMORANDUM OPINION

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE; Jason G. Sheasby, Lisa Glasser, H. Annita Zhong, IRELL & MANELLA LLP, Los Angeles, CA,

Attorneys for Plaintiff.

John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Robert J. Benson, Jeffrey L. Johnson, BAKER BOTTS LLP, Houston, TX; T. Vann Pearce, Jr., ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington, DC; Yufeng (Ethan) Ma, ORRICK, HERRINGTON & SUTCLIFFE LLP, Shanghai, PRC; Michael C. Chow, ORRICK, HERRINGTON & SUTCLIFFE LLP, Irvine, CA,

Attorneys for Defendants.

September 19, 2026

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is Defendants' Motion for Judgment as a Matter of Law, or, in the Alternative, for Remittitur or a New Trial. (D.I. 396). I have considered the Parties' briefing (D.I. 397, 407, 414). For the reasons that follow, this motion is GRANTED IN PART AND DENIED IN PART. Defendants' Rule 50(a) Motion (D.I. 333), Plaintiff's Rule 50(a) Motion (D.I. 334), and Plaintiff's Motion for Enhanced Damages and Prejudgment and Post-judgment Interest (D.I. 393) are DISMISSED AS MOOT.

## I. BACKGROUND

After a four-day trial (D.I. 348, 349, 350, 352),[1] the jury found that Defendants had infringed Claim 84 of U.S. Patent No. 6,936,936 (the '936 Patent), Claim 1 of U.S. Patent No. 7,239,111 (the '111 Patent), Claim 1 of U.S. Patent No. 7,453,223 (the '223 Patent), and Claim 3 of U.S. Patent No. 8,624,550 (the '550 Patent). (D.I. 339). The jury found that Defendants had willfully engaged in infringement and awarded damages of $13,638,219. (*Id.*). Defendants moved for Judgment as a Matter of Law pursuant to Rule 50(a) (D.I. 334) and now renew that motion under Rule 50(b). (D.I. 396). In the alternative, Defendants ask that I grant a new trial or grant remittitur of the damages amount to nominal damages or grant zero damages. (*Id.*).

## II. LEGAL STANDARD

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, 'granted only if,

---

[1] These docket items comprise the four days of trial transcripts. The transcripts are consecutively numbered. To improve readability, in this opinion, I will refer to the trial transcripts as "Tr. x:y" as opposed to (D.I. abc at x:y). The jury charge conference occurred on a day when there otherwise was no trial. It is separately paginated. (D.I. 351).

viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citation omitted).

"To prevail on a renewed motion for JMOL following a jury trial, a party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied by the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (cleaned up). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The Court "must not determine credibility of witnesses, and must not substitute its choice for that of the jury between conflicting elements in the evidence." *Perkin-Elmer*, 732 F.2d at 893. Rather, the Court must determine "whether a reasonable jury, given the record before it viewed as a whole, could have arrived at the conclusion it did." *Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998).

Under Rule 59(a), a court may grant a new trial on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The decision to grant or deny a new trial is committed to the sound

discretion of the district court. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). That said, a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand" or where the verdict "cries out to be overturned" or "shocks [the] conscience." *Williamson*, 926 F.2d at 1352-53.

## III. DISCUSSION

Defendants raise three main issues in their motion. They argue: (1) Plaintiff failed to show infringement of any asserted claim, (2) Plaintiff failed to offer evidence of Defendants' willfulness, and (3) Plaintiff failed to present such sufficient evidence as would allow the jury to arrive at a legally supportable damages award. (D.I. 397 at 1).

### A. Infringement

At issue at trial were claim 84 of the '936 patent, claim 1 of the '111 patent, claim 1 of the '233 patent, and claim 3 of the '550 patent. Defendants present five arguments as to why Plaintiff failed to present adequate evidence to support infringement of these claims.

#### 1. Generation of Identification Signal ('111, '233, and '936 Patents)

As Defendants correctly note, "The asserted claims of the '111, '233, and '936 patents all require a USB charger with 'an identification subsystem for providing an identification signal,' or similar language that the identification system 'is configured to generate an individual signal.'" (D.I. 397 at 14). The crux of Defendants' argument is that all Plaintiff showed at trial was that it was "the mobile device [that] generates or provides the identification signal, not [Defendants'] USB charger." (*Id.*). Thus, Defendants argue, Plaintiff failed to prove infringement of the three claims.

Plaintiff's "infringement theory applied to two charging protocols, called BC 1.2 and Apple [c]harging."[2] (*Id.*; *see also* Tr. 223:3-8). As to BC 1.2, Defendants argue that, pursuant to the BC 1.2 specification, "the claimed 'identification signal' is 'generated' or 'provided' by a connected mobile device, rather than a charger." (D.I. 397 at 14). "[T]he identification signal is generated by the mobile device, sent to the adapter via the mobile device's D+ line, and returns to the mobile device on the D- line. There is no 'source' of a signal in the adapter." (*Id.* at 14-15).

I do not find Defendants' argument convincing. Plaintiff has pointed to ample evidence in the record, with accompanying citations, that would support a jury's finding of infringement. (*See generally* D.I. 407 at 13-14). Simply by way of example, Plaintiff presented evidence at trial that a microchip located within the Defendants' products is responsible for sending the identification signal (Tr. 292:11-15), and, during cross-examination, Plaintiff elicited testimony from Defendants' own witness that "switches" on that microchip, when "switched on and off within [Defendants'] adapter," would be responsible for "send[ing] signals on the D- and D+ lines." (Tr. 656:13-19).

Defendants' best response, as laid out in Defendants' reply brief, is that Plaintiff's witness "stated that testing 'show[ed] the signals going back and forth on BC 1.2,' but failed to explain where the identification signals were generated, and instead simply labeled 'the piece that is answering' as '[t]he identification signal.'" (D.I. 414 at 9 (citing Tr. 225:2-3, 241:24-242:5, 244:5-6)). Even a slightly more comprehensive view of the trial record belies Defendants' response, however, as Plaintiff's witness specifically states, of the identification signal: "It's

[2] BC 1.2 stands for "Battery Charging Specification Revision 1.2." It was published on December 7, 2010. (PX0158.1).

coming from [Defendants'] adapter, and it's going to the phone." (Tr. 244:7-8). In light of the testimony presented at trial, a reasonable jury could find for Plaintiff on this infringement issue.

As to Apple charging, Defendants argue, first, that Plaintiff presented "no evidence that any [of Defendants'] product[s are] configured to use . . . Apple charging without modification." (D.I. 397 at 15). Second, Defendants argue that Plaintiff's expert witness "did not discuss . . . any technical documentation describing how the Apple charging protocol functions," and instead based "[h]is opinions . . . on anonymous blog and forum posts, many of which disclaimed expertise, disclaimed access to the protocol specification, or cautioned that an adapter manufacturer [s]ometimes . . . doesn't follow the standard for a given protocol." (*Id.* at 16) (cleaned up). Third, Defendants claim that, as with the BC 1.2 protocol, the evidence adduced by Plaintiff at trial tended only to show that "mobile devices provide a BC 1.2 identification signal, not adapters, so showing that the BC 1.2 and Apple protocols function in the same way shows non-infringement." (*Id.*).

I am not persuaded by Defendants' arguments as to Apple charging. I begin with Defendants' third argument, which is their weakest; in Defendants' own words, "BC 1.2 and [the] Apple [charging] protocols function in the same way." (*Id.*). I have already found that there was sufficient evidence at trial to support a finding that Defendants' adapter generated or provided the "identification signal" under the BC 1.2 protocol, and accordingly, it follows that there was sufficient evidence that Defendants' adapter generated or provided the "identification signal" under the Apple charging protocol as well.

I am also not convinced by Defendants' second argument that Plaintiff's evidence as to the Apple charging protocol "depended entirely on anonymous internet posters who admitted they lacked relevant knowledge or expertise." (D.I. 414 at 10). Even if, as Defendants suggest,

the evidentiary record demonstrated that Plaintiff's expert's conclusions depended wholly on unreliable sources, characterizing the totality of the evidence in this way ignores the fact that Defendants' own expert admitted on cross examination that "every single data sheet for the [micro]chips" in "every single adapter" say that "they support [both] the Apple signal[ing] protocol and the BC 1.2 protocol," as well as the fact that "[Defendant's] [own] engineers have admitted under oath that they use BC 1.2 signall[ing] and Apple signall[ing]." (*See* Tr. 652:17-656:19). Moreover, Plaintiff presented Defendants' interrogatory responses to the jury, among which was an admission that various "[r]epresentative accused products . . . are *capable* of charging Apple devices with Apple 2.1A and Apple 2.4A protocols." (Tr. 409:8-11). A reasonable jury, considering this evidence, could easily consider that Defendants' products were infringing in relation to the Apple charging protocol.

I turn to Defendants' first argument that there was insufficient evidence that Defendants had "prove[d] the accused products were capable of using an infringing mode without modification." (D.I. 414 at 10) (emphasis deleted). I note that at the pretrial conference, Plaintiff and Defendants agreed that the claims would be directed to whether the accused products had the "capability" to use the Apple protocol, "not about actually doing it." (*See* D.I. 297 at 42:22-44:1). But, as I noted earlier, there was sufficient evidence in the record showing that Defendants' products were capable of using this protocol without modification. Defendants' best argument, that "Apple's own documents showed that [an alternative non-infringing] protocol, which almost all [Defendants'] products could use, would be prioritized," does not convince me otherwise. (D.I. 414 at 10). "Almost all" plainly does not mean "all", and, even if it did, the fact that the non-infringing protocol would be "prioritized" is irrelevant, given that both parties

agreed that infringement could be proved simply by demonstrating the "capability" of Defendants' products to infringe.

In short, after drawing all reasonable inferences in favor of Plaintiff as the verdict winner, I find that there was substantial evidence in the record supporting the jury's finding of infringement.

### 2. "Without Regard To" Limitation ('550 Patent)

Claim 1 of the '550 patent describes an "adapter configured to supply current on the VBUS line without regard to at least one associated condition specified in a USB specification." ('550 Patent, Claim 1 at 12:10-11). Defendants argue that the "evidence [does] not support a jury verdict that any [of Defendants'] products are an 'adapter configured to supply current on the VBUS line ***without regard to*** at least one associated condition specified in a USB specification' . . . for similar reasons already discussed as to the 'configured / generate an identification signal' terms: the [accused] products do not determine how much power to supply." (D.I. 397 at 16-17).

Plaintiff points to testimony in the record demonstrating that USB 2.0[3] can practice a range "from 500 microamps up to 500 milliamps[,] which is .5 amps." (D.I. 407 at 15 (citing Tr. at 310:21-312:9)). Further testimony adduced at trial showed, based on oscilloscope data, that Defendants' products were capable of "drawing substantially more power and substantially more current than USB [2.0] allows." (*Id.*).

Thus, there was sufficient evidence presented at trial showing that Defendants' products could in fact determine how much power to supply, without regard to at least one condition

---

[3] "USB 2.0 is a revised USB specification that was released in April 2000. It provides standards and specifications to be used with USB technology. It is prior art to the asserted patents. The patents assert to build on, or improve upon, the capabilities described in USB 2.0." (D.I. 249 at 7-8 n. 6) (citations omitted).

specified in the USB specification. A reasonable jury could credit this testimony, and it constitutes substantial evidence supporting the jury's finding of infringement.

**3. "USB Communications Path" ('550 Patent)**

"Claim 3 of the '550 patent requires an adapter comprising a 'USB communication path.'" (D.I. 397 at 17; *see* '550 patent at 12:15-16). Defendants argue, "[T]he D+ and D- lines of the accused products are not capable of sending USB 2.0 communications and therefore cannot be the claimed 'USB communication path.'" (D.I. 397 at 17). Yet Defendants concede that Plaintiff's expert in fact testified that "in USB 2.0, communication happens over the data plus and data minus lines or D+ and D-."[4] (*Id.*). Plaintiff makes the same point (D.I. 407 at 15), noting that its expert specifically testified that Defendants' products "repurpose[d] the USB communication path to tell the phone that it is not a host or hub." (Tr. 309:9-310:14).

Although Defendants point to testimony from their own expert witness to the effect that "USB communication does not happen over the D+ and D- lines in the accused products, and they cannot be used for USB communications" (D.I. 397 at 17 (emphasis deleted) (citing Tr. 601:3-602:1, 603:1-605:2)), in assessing the sufficiency of the evidence, I "must not determine credibility of witnesses, and must not substitute [my] choice for that of the jury between conflicting elements in the evidence." *Perkin-Elmer*, 732 F.2d at 893. There is a conflict between Plaintiff's and Defendants' witnesses, and the jury was entitled to determine whose testimony was more credible. The jury has reasonably done so and found infringement, and I will not second-guess the jury's credibility determinations.

**4. "Identification Signal" Limitation ('111 and '936 Patents)**

[4] As Plaintiff correctly notes, Defendants "do[] not dispute" whether "all representative products contained D+ and D- lines." (D.I. 407 at 15).

First, as to the '111 patent, Defendants argue that Plaintiff failed to prove that any of the accused products contained a USB adapter containing "an identification subsystem configured to generate an identification signal, wherein the identification signal is configured to indicate to the mobile device that the power socket is not a USB host or hub." ('111 patent at 12:1-4). Defendants note that I had previously construed "power socket" as having its plain and ordinary meaning (*see* D.I. 255), and that I had supposedly[5] "admonished [Plaintiff] that its expert should not 'say power socket is really a power source.'" (D.I. 397 at 18 (quoting D.I. 243 at 19:17-25); *see also* D.I 414 at 11 (citing D.I. 243 at 19:17-25)). According to Defendants, Plaintiff's expert witness did in fact conflate "power socket" with "power source," and Defendants note that Plaintiff's expert admitted on cross that his "own example of a phone connected to a laptop, where there is no 'identification signal,' shows the identification signal does not identify the power socket: the laptop of course [w]ould be . . . connected to a power socket." (D.I. 397 at 18 (citing Tr. 339:24-340:9)).

In response, Plaintiff points to the fact that its expert did in fact testify that, with respect to each of the accused products, "[w]ith the identification signal," the device being charged "knows that the power socket -- I'm showing here a wall outlet . . . -- is not a host or hub so it can draw whatever it needs." (D.I. 407 at 16 (quoting Tr. 300:20-24)). Plaintiff also correctly states, "The claim does not require the signal to identify the 'type of power socket;' it merely requires that the adapter be configured to receive energy from a power socket, and to identify that the socket is 'not a host or hub.'" (D.I. 407 at 17). Defendants reply: "In its answering brief,

[5] I write "supposedly," because in the page and lines twice cited by Defendants (D.I. 243 at 19:17-25), I did not say anything remotely resembling what Defendants say I said. Regardless, I had previously stated that "power socket" should be given its plain and ordinary meaning (D.I. 255), and I agree that the plain and ordinary meaning of "power socket" is not synonymous with "power source."

[Plaintiff] offers no response to the fact that [its expert's] testimony regarding the supposed 'identification' signals did not account for cases in which 'no power socket is connected at all,' such that the signal cannot identify anything about the power socket." (D.I. 414 at 11).

Plaintiff has the better of this argument. Plaintiff's expert explicitly testified that the accused products send identification signals that inform the device being charged that the power socket is not a host or hub. (Tr. 300:13-24). In light of this testimony, a reasonable jury could credit Plaintiff's expert to find infringement. I fail to see how Defendants' argument, that the accused products in some cases send no identification signals (as when devices are connected to, e.g., a laptop), would undermine the validity of the jury's infringement finding.

Second, as to the '936 patent, Defendants argue that "it is undisputed that the supposed 'identification signals' in BC 1.2 (0.7V) and Apple charging (2.7V) never reach the USB 2.0 logic high level of 2.8V." (D.I. 397 at 18). Plaintiff's expert testified that the "logic high" was equivalent to 2.35 volts for "the iPhone"[6] and 0.4 volts for the BC 1.2 protocol (D.I. 407 at 17 (citing Tr. 227:2-9)), and further testified that the accused products each met this threshold (Tr. 244:17-24, 248:25-249:2, 255:16-20, 292:21-22, 296:2-4). Plaintiff also correctly points out that the "'936 patent's specification discloses a preferred embodiment of a 2-volt logic high signal, making clear that no such requirement [i.e., that the "logic high" signal must exceed 2.8 volts] exists." (D.I. 407 at 17 (citing '936 Patent at 9:21-28 & Fig. 3)).

I agree with Plaintiff. Defendants cite nothing in support of their contention that the USB 2.0 logic high level should be 2.8V, and, as Plaintiff points out, the '936 patent does not require this. Plaintiff presented testimony at trial that would allow a reasonable jury to conclude that the

---

[6] I assume that "iPhone" charging refers to the Apple charging protocol; this appears to make sense, and, if it didn't, I would expect Defendants to have pointed this out in their reply brief.

logic high level constituted 2.35 for the Apple protocol and 0.4 volts for the BC 1.2 protocol and further presented such evidence as would allow a reasonable jury to conclude that the accused products had met this threshold. I decline to overturn the jury verdict.

**5. USB Type-C Products ('111, '233, and '936 Patents)**

Three of the four asserted patents require "a USB connector." For example, claim 1 of the '111 patent claims a USB adapter "comprising . . . a USB connector coupled to the power converter and the identification subsystem, the USB connector being configured to couple the power output and the identification signal to the mobile device." ('111 patent at 12:5-8). I construed "USB" as "Universal Serial Bus as described in Universal Serial Bus Specification Revision 2.0 and related versions of this standard at the time of the claimed invention." (D.I. 328 (jury version, *see* Tr. 753); D.I. 255 (original)). The time of the claimed invention is October 2001.

Defendants argue that Plaintiff failed to prove that the accused USB Type-C products[7] infringed the '111, '233, and '936 patents' requirements that the products use a USB connector. (D.I. 397 at 18-19). Defendants cite my claim construction order and argue, since "USB-C was released in August 2014," and "the asserted patents claim priority to October 2001," there is no evidence of literal infringement because "[t]here is no evidence that USB Type-C connectors existed or were described in any USB standard in 2001." (D.I. 397 at 18). In response, Plaintiff points to testimony by its expert that "the USB 2.0 specification accommodates later-developed connector geometries," such as USB Type-C connectors, and notes that even Defendants'

[7] Plaintiff notes that the Type-C connectors were one of the seven categories of products accused of infringement. (D.I. 407 at 17 n.4). One of the seven categories was only accused of infringing the '550 patent. (Tr. 776; *see* D.I. 339 at 2). The verdict form provided for the jury to decide infringement of the '111, '233, and '936 patents by six categories of products, one of which was described as "Type-C Wall Chargers." (D.I. 339 at 2).

"expert admitted that the USB C cable includes the USB 2.0 connector wires and 'USB C is able to transmit USB 2.0 data.'" (D.I. 407 at 18 (citing Tr. 236:22-237:12, 660:18-661:9)).

I am not persuaded by Plaintiff's argument as to literal infringement. As Defendants correctly note, at the time of the claimed invention in 2001, USB Type-C connectors were over a decade away from their initial release in August 2014. (PX131.14). As such, I don't see how the USB-C connector could meet the claim construction language of USB as being "Universal Serial Bus as described in Universal Serial Bus Specification Revision 2.0 and related versions of this standard at the time of the claimed invention [i.e., 2001]." (D.I. 328). The asserted patents could not claim a technology that was not released until years after the fact; Plaintiff's testimony that the USB 2.0 specification could "accommodate" USB Type-C connectors is legally insufficient for a jury to find that USB-C connectors could have been described by the much earlier USB 2.0 specification.

That said, Plaintiff presented evidence at trial that the Type-C USB products infringed under the doctrine of equivalents.[8] Defendants argue that Plaintiff failed to prove infringement under the doctrine of equivalents, because Plaintiff's expert's testimony "f[ell] far short . . . of the 'particularized testimony' required to support an infringement verdict." (D.I. 397 at 18-19). Specifically, Defendants argue that Plaintiff's expert's "equivalence theory was . . . identical to his literal infringement theory," which therefore fails to "provide[] the jury with a sound basis for a doctrine-of-equivalents finding." (*Id.* at 19).

Plaintiff responds by stating that its expert witness "explained that the USB-C connectors in [Defendants'] products have the function of coupling the power output and identification

[8] The verdict does not distinguish between literal and DOE infringement. (D.I. 339). The Court's jury instructions on DOE (Tr. 755:19-757:25) are unchallenged. The jury instructions made clear that the only element for which DOE was at issue was the "USB connector" limitation.

signal of the USB adapter to a mobile device, through the way of providing the same signals over the exact same wires as a USB 2.0 connector, to achieve the exact same result[.]" (D.I. 407 at 18-19). Plaintiff's expert's testimony specifically directed to the doctrine of equivalents regarding the USB-C connectors is concise, so I reproduce it in full below:

> So the function is coupling the power output and identification signal of the USB adapter to a mobile device. It does that. The way it operate[s] over the same USB 2.0 wires, VBus, ground, D+, and D- and the result is enabling communication of an identification signal over D+ and D- and increasing the power draw over VBus.

(Tr. 238:21-239:1).

I think that this testimony is sufficient, albeit perhaps just barely, for a jury to find infringement by the doctrine of equivalents. I disagree with Defendants' theory that the doctrine of equivalents analysis was defective, because it was "identical to [Plaintiff's expert's] literal infringement theory," as it both overstates the degree of overlap and is, as Plaintiff notes, "irrelevant." (D.I. 407 at 18). The Federal Circuit has held,

> Our "particularized testimony" standard does not require [an expert witness] to re-start his testimony at square one when transitioning to a doctrine of equivalents analysis. Indeed, we think it desirable for a witness to incorporate earlier testimony in order to avoid duplication. The fact that [the expert witness] did not explicitly do so does not mean he did not implicitly incorporate his earlier testimony.

*Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007). I think that Plaintiff's expert gave such particularized testimony and linking argument with respect to the function, way, and result as to the USB-C connectors as would be adequate to support the jury verdict under a doctrine of equivalents theory. I therefore decline to overturn the jury's verdict that the USB Type-C Products infringed the asserted claims. *See Egnera, Inc. v. Cisco Sys., Inc.*, 141 F.4th 1350, 1362 (Fed. Cir. 2025) ("We will uphold [a jury] verdict if there [is] sufficient evidence to support *any* of the [prevailing party's] alternative factual theories; we assume the

jury considered all the evidence and applied the appropriate burden of proof to all factual theories presented.") (internal citation omitted).

**B. Willfulness**

Defendants argue that Plaintiff failed to prove evidence of willful infringement, because, at most, all Plaintiff presented at trial was "evidence of notice of the patents and [Plaintiff's] assertion of infringement." (D.I. 397 at 19). The Federal Circuit has held that when "[t]he evidence adduced at trial merely demonstrates [a defendant's] knowledge of the [asserted] patent and [a defendant's] direct infringement of the asserted claims[,] . . . [that evidence] is necessary, but not sufficient, for a finding of willfulness. Rather, willfulness requires deliberate or intentional infringement." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021). Defendants argue that Plaintiff did not prove any deliberate or intentional infringement, because "[t]here was no evidence of copying or using [Plaintiff's] patents to develop the accused products. Nor was there evidence of [Defendants] trying to cover up its infringement or lacking a reasonable belief in noninfringement." (D.I. 397 at 20).

Plaintiff points to testimony in the record that it "specifically detailed its infringement to [Defendants] in 2017, including in charts with detailed research and testing results—the same type of testing results that were presented to the jury during trial." (D.I. 407 at 19 (citing Tr. 422:17-424:7)). Plaintiff elicited testimony from one of Defendants' employees, Mr. Pai, that Defendants failed to "do any analysis at all of what it would take for [Defendants] to remove the infringing functionality from its products." (Tr. 506:17-20).

Defendants reply that "the supposed 'acknowledgment' Plaintiff cites was [the witness's] response on his own behalf" after the witness was asked if he had personally conducted any infringement analysis. (D.I. 414 at 13 (citing Tr. 506:17-20)). I agree with this characterization. I

don't think Mr. Pai was testifying that Defendants either had or had not conducted any analysis at all. Furthermore, I note that Mr. Pai's background is in marketing and that he testified that he had no independent understanding of the technology beyond what the product management team would explain to him. (Tr. 505:13-23). His testimony alone is plainly insufficient to establish that Defendants conducted no reasonable investigation as to whether their products infringed.

Plaintiff separately notes that another witness "testifie[d] that 'Portions of the [infringing] protocol [in Defendants' products] [we]re identical'" to that covered by the patents in suit. (D.I. 407 at 21). Plaintiff argues that this testimony establishes that the "infringing charging protocols implemented by [Defendants] are a copy of the designs . . . described in the patents-in-suit." (*Id.*). This same witness, however, also expressly conceded that he lacked any knowledge as to whether "[Defendants] designed their products with the patents-in-suit in mind." (Tr. 338:16-18). As such, this testimony is also insufficient to support a finding of deliberate or intentional infringement.

At most, Plaintiff presented evidence showing that it had informed Defendants that it thought Defendants' products infringed the patents-in-suit. The Federal Circuit has held that there is no "rule that to avoid willfulness one must cease manufacture of a product immediately upon learning of a patent, or upon receipt of a patentee's charge of infringement, or upon the filing of suit." *Gustafson, Inc. v. Intersys. Indus. Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990). Any evidence Plaintiff presented showed, at most, that Defendants infringed the patents-in-suit and that Defendants knew of these patents' existence. The evidence fails to show that Defendants did so deliberately or intentionally. The evidence presented at trial was thus insufficient to permit a reasonable jury to find that Defendants had infringed the patents willfully, and I reverse the jury's finding of willful infringement. *Bayer*, 989 F.3d at 988.

**C. Damages**

Defendants argue that the damages "verdict lacks a sufficient evidentiary basis . . . [because] it does not reflect the outcome of the hypothetical negotiation [and because] it is not supported by any evidence of apportionment." (D.I. 397 at 2).

**1. Hypothetical Negotiation**

Plaintiffs and Defendants agree that Plaintiff began licensing negotiations with its counterparties by proposing an initial fee of $0.50 per device. (D.I. 397 at 2, D.I. 407 at 2).

Defendants argue the evidence presented at trial only established that the $0.50 constituted an "initial proposed rate" set as a matter of Plaintiff's internal policy to license Plaintiff's patent portfolio and failed to establish that the "$0.50 rate [constituted] the *outcome* of a hypothetical negotiation." (D.I. 397 at 3). Plaintiff's patent portfolio "include[s] over 50 U.S. patents and over 200 patents worldwide . . . includ[ing] unexpired patents which [Plaintiff] has not abandoned." (*Id.* at 4). Under Federal Circuit law, Defendants argue this evidence of the $0.50 licensing fee would be insufficient to allow a jury to determine damages; a plaintiff may not "obtain a particular royalty rate merely by relying on its internal 'policy.'" *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1379 (Fed. Cir. 2021). Thus, Defendants argue, to allow the jury's award to stand would be akin to assuming "that a hypothetical negotiation would conclude on [Plaintiff's] opening offer with no pushback from [Defendants]—a position without any basis in the record." (D.I. 397 at 5).

Defendants argue that Plaintiff's cost-savings theory, which Defendants characterize as having been "rightly rejected" by the jury, would not support the verdict. (*Id.* at 9). In order to prove damages based on a cost-savings theory, "a patentee must show that the defendant's infringement allowed it to avoid a 'different, more costly course of action.'" (*Id.* (quoting *Prism*

*Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017))). Defendants argue, "[Plaintiff] failed to show that [Defendants'] infringement allowed [Defendants] to realize $2.68 [per unit] in cost savings." (D.I. 397 at 10). In addition to reiterating their arguments regarding Plaintiff's supposed failure to apportion damages and Plaintiff's failure to show what Defendants may have agreed to as the result of a hypothetical negotiation (*Id.* at 10-11), Defendants argue that Plaintiff's "purported noninfringing alternative was not commercially acceptable." (*Id.* at 10) (emphasis deleted). "A proposed noninfringing alternative must be commercially 'reasonable' to be 'acceptable,'" (*Id.* (quoting *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1342 (Fed. Cir. 1999))), and as such, Defendants argue that the $2.68 cost savings number is unsupported by the evidence.

After giving Plaintiff, as the nonmoving party, the benefit of all logical inferences and viewing the record in the light most favorable to Plaintiff, I do not think that Defendants have advanced a sufficiently convincing argument. In light of the evidence presented at trial, a reasonable jury could have reached the conclusion that a $0.50 licensing fee would have been the outcome of a hypothetical negotiation between Plaintiff and Defendants.

The evidence at trial shows that Plaintiff began patent licensing negotiations at a base rate of $0.50 cents per unit and that Plaintiff did not change this rate based on the number of patents that a potential licensee might seek to license. (Tr. 416:15-417:4). The evidence showed that Plaintiff would expressly discuss cost savings with potential licensees and that Plaintiff had in fact done so in the past during licensing negotiations.

> Q. Do you expressly discuss cost savings with potential licensees?
> A. Yes, we do.
> Q. What does this slide depict?
> A. Yes. And so here, again -- and this was the cost savings in this instance that we had done for [a counterparty], so it was a little bit [specific to that counterparty.] But, you know, what we did was we would say, "Well, what are the components"

> -- or, "How much would it cost for you to do it in a way that didn't infringe?" And it often would involve a bunch of different components."

*Id.* 421:4-14

Plaintiff offered evidence that it could either adjust up or down this initial $0.50 based on a variety of considerations.

> Q. And I think earlier you said that that licensing program involves typically starting at 50 cents for a potential licenses; correct?
> A. The initial rate that we proposed is 50 cents per device, correct.
> Q. There's some adjustment, for example, like discou[n]ts or something else that might be made to that 50 cents; correct?
> A. Yeah. As I testified earlier, there could be discounts for not taking the case [to] trial, other discounts as well as additional values that could take the number up.
> Q. And things that take it down, right, like volume discounts and other things; correct?
> A. Yeah. Depending on the situation with the company we would discuss various discounts, correct.

*Id.* 435:13-436:2

Finally, Plaintiff presented evidence showing that Defendants' infringement resulted in cost savings of $2.68 per unit.

> [A.] So what you can see is that the cost savings that [Defendants] achieved by using [Plaintiff's] patents instead of adding the components necessary to enable enumeration is $2.68 per unit after applying all of those discounts.
> Q. Can you summarize again for the jury how much it would cost for [Defendants] to retain USB charging but not use [Plaintiff's] patents?
> A. Yes, sir. The cost savings we just looked at is $2.68 per unit after applying the discounts. The number of units is 27.3 million. So the total cost savings is $73.1 million.[9]

[9] I am quite dubious about Plaintiff's cost savings evidence. Plaintiff treats non-infringing alternatives and cost savings as being the same thing. I do not read the relevant and frequently-cited Federal Circuit cases as saying that they are the same thing. (*See* D.I. 432). Nor do I think the way the cost savings theory was applied to the facts of this case are at all analogous to the leading Federal Circuit cases on the subject. Nevertheless, at the *Daubert* stage of the case, Defendants did not challenge the cost savings theory on any basis at all related to the above-stated concern. (*See* D.I. 261 at 31 n.15). Thus, Defendants waived any *Daubert* challenge to the viability of Plaintiff's theory.

*Id.* 464:18-465:3.

Nor do I credit Defendants' argument that enumeration would not have constituted a commercially acceptable infringing alternative. Defendants, in an interrogatory response, identified as one possible "non-infringing alternative" a USB adapter that could, "through the enumeration process, [determine] the required current/power level for the mobile device." (PX0048.94.) This alternative method "would, at most, add several seconds to any battery charging procedure, which would not be noticed by a consumer."[10] (*Id.*). Indeed, Defendants' expert gave the following testimony, "Q. And you identify enumeration as an acceptable alternative for Anker; correct? A. Yes." (Tr. 698:18-20).

Finally, as Plaintiff correctly notes in its answering brief, Defendants "did not dispute the relevance of cost[] savings . . . to the hypothetical negotiation. . . . To the contrary, [Defendants] expressly argued that the non-infringing alternative would only cost 'a penny,' that the cost savings represented the 'value of this invention,' and urged that the jury award that amount as the damages." (D.I. 407 (citing Tr. 814:7-815:5)). Contrary to Defendants' argument, this is not a case where Plaintiff tried to "obtain a particular royalty rate merely by relying on its internal 'policy.'" (D.I. 397 at 3 (citing *Omega Patents*, 13 F.4th at 1379)).

Thus, in light of all the evidence presented at trial, and drawing all reasonable inferences in favor of Plaintiff, I think that a reasonable jury could have found that the outcome of a hypothetical negotiation would have been $0.50 per unit, given (1) Plaintiff's policy of

[10] There is no language here identifying this alternative as a "commercially acceptable" non-infringing alternative. The interrogatory in question merely asked Defendants to identify "alleged non-infringing alternative[s]," without describing these alternatives as being "commercially acceptable." (PX0048.90). Nevertheless, I think that a jury could draw the reasonable conclusion that Defendants' characterization that the alternative method would result in changes that "would not be noticed by a consumer" implies that enumeration would be "commercially acceptable."

beginning negotiations at $0.50 per unit, (2) evidence offered by Plaintiff that cost savings to Defendants would have been $2.68 per unit, and (3) evidence offered by Defendants that their cost savings would have been about $0.01 per unit. "[A] jury is entitled to choose a damages award within the amounts advocated by the opposing parties," and I think that the jury did so here. *See Bayer*, 989 F.3d at 983.

**2. Apportionment**

That said, I do not think that Plaintiff has properly apportioned damages. Nor am I convinced by Plaintiff's argument that its "cost-savings" approach absolves Plaintiff of its duty to apportion damages. Accordingly, I don't think that Plaintiff has offered substantial evidence in the record that would allow a reasonable jury to assess damages, and thus, I will reduce the jury's damages to zero. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020) (affirming a reduction of the jury's damages to zero, because "[35 U.S.C. § 284] does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts"); *Rex Medical, L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1298-99 (Fed. Cir. 2025).

Defendants argue that Plaintiff did not present sufficient "'evidence tending to separate or apportion . . . the patentee's damages between the patented feature and the unpatented features' to show *the incremental value* of the patents-in-suit." (D.I. 397 at 5-6 (quoting *Omega Pats.*, 13 F.4th at 1376)). Defendants argue that Plaintiff was required to apportion because: (1) "the purported advantage of the claims—faster charging—did not drive demand for [Defendants'] products," (2) "[Plaintiff's] claims covered both conventional and purportedly inventive features, so [Plaintiff] was required to show the incremental value that its patented improvement added to the [accused product] as apportioned from the value of any conventional features," and (3) "evidence of a portfolio license rate that is offered to all licensees fails to account for

apportionment absent evidence of a comparable license or comparable negotiation to support an identical [$0.50] rate for the specific patents-in-suit." (D.I. 397 at 6) (citations omitted). Thus, in the absence of evidence apportioning the $0.50 portfolio licensing fee to the individual patents, Defendants argue that the "jury thus had no way to determine the incremental value of the asserted patents and arrive at a legally supported damages award." (*Id.* at 8).

Plaintiff's attempts to show that it had introduced substantial evidence of apportionment at trial, sufficient to support the jury verdict, do not convince me. Plaintiff argues that "there was no evidence that the infringing USB adapters had any 'conventional features' unrelated to the patents." (D.I. 407 at 4) (emphasis deleted). Plaintiff cites nothing to support this assertion, however, whereas Defendants point to trial testimony elicited from Plaintiff's damages expert on cross examination that the USB adapters in fact contained "conventional features" unrelated to the patents. (D.I. 397 at 9). For example, Plaintiff's damages expert conceded that Anker products contained "metal prongs that you plug into the wall socket," "a power converter," and a "USB 2.0 connector," all of which existed before the patents in suit were filed. (Tr. 478:25-479:23). Plaintiff's damages expert also conceded that he did not "describe any analysis in which [he] apportion[ed] value between these unpatented components in the . . . accused products and the allegedly patented features." (Tr. 479:24-480:3).

Plaintiff then presents what appears to be a built-in-apportionment theory, arguing that "the $0.50 offer was already specific to the patents-in-suit, and thus no further apportionment would have been appropriate. . . . [T]he licensing negotiations focused on the specific four patents-in-suit (including the negotiations with [Defendants], which identified exactly these four patents), and the undisputed evidence was that the four patents are the only 'ones that were

important to this USB power charging.'" (D.I. 407 at 5 (citing Tr. 442:20-25, 443:5-15)) (emphasis deleted). I am not convinced by this argument either. The Federal Circuit has held:

> [W]hen a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required. That is because a damages theory that is dependent on a comparable license (or a comparable negotiation) may in some cases have "built-in apportionment." Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent. For built-in apportionment to apply, the license must be sufficiently comparable in that principles of apportionment were effectively baked into the purportedly comparable license. The patentee has the burden of proving damages, and where licenses are at issue, that includes the burden to prove that the licenses were sufficiently comparable.

*Omega Pats.*, 13 F.4th at 1376-77 (cleaned up)

Defendants argue that Plaintiff failed to show built-in apportionment, because "[Plaintiff] offered the $0.50 rate to multiple potential licensees without regard to the details of their accused products. . . . There is no evidence that any of the potential licensees approached by [Plaintiff] accepted the $0.50 opening offer." (D.I. 397 at 7). The testimony adduced at trial showed that the $0.50 number to license the portfolio was indeed merely an opening offer; Plaintiff's own witness, who personally participated in many of the negotiations, testified that other considerations could result in an adjustment either up or down from this initial $0.50 rate. (Tr. 435:13-436:8; 442:13-19). Given that this $0.50 is merely an opening offer, however, the absence of evidence showing that other licensees paid a similar amount for comparable licenses is fatal to Plaintiff's case. *See Omega Pats.*, 13 F.4th at 1379. ("But absent evidence of a comparable license or comparable negotiation to a support an identical . . . rate" for the patents in suit, "we fail to see how this patent/claim-independent approach accounts for apportionment."). There is no evidence that any other licensee of the patents-in-suit was in the same or similar economic or business position as Defendants were, and, in their post-trial briefing, Plaintiff does

not point to any evidence that any potential licensee would accept or in fact did accept this $0.50 initial proposed rate.[11] Nor did Plaintiff put on evidence showing how, even assuming that the licensees were comparable to Defendants in the first place, these licensees responded to the $0.50 initial proposed rate.

Finally, I note that Plaintiff's response in its answering brief to Defendants' argument selectively quotes the trial record, with good reason. (D.I. 407 at 5). Plaintiff's witness did not merely testify that the four patents-in-suit were the ones that were central to licensing negotiations. Plaintiff's witness also conceded, "There was one other patent . . . that we had suggested or shown to [potential licensees] at some point in time but eventually, you know, didn't use that one anymore." (Tr. 443:1-4). Without further elaboration or information presented to the jury as to when that fifth patent ceased to be shown to potential licensees, or testimony as to whether or how that affected the proposed licensing rates (if it did), I don't think that the testimony of Plaintiff's witness constitutes such substantial evidence as would enable the jury to apportion damages.

Plaintiff argues, however, that its "cost savings" approach obviates, as a matter of law, its duty to perform apportionment. (D.I. 407 at 8). Plaintiff cites two cases in support of this contention, but I do not think that either of these cases rescue Plaintiff from its duty to prove apportionment.

First, Plaintiff cites *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1240 (Fed. Cir. 2011) for the contention that Defendants' argument that Plaintiff's "calculation of the cost savings that [Defendants] enjoyed from its infringement was not 'apportioned' . . . misstates both

---

[11] In connection with the *Daubert* hearing, the twenty-eight agreements were produced. They were all lump sum agreements, twenty-seven of which were for $1,000,000 or less. (D.I. 261 at 22 n.7).

the evidence and the law." (D.I. 407 at 8). I do not understand why Plaintiff cites *Powell*, and Plaintiff does not elaborate. The cited portion of Plaintiff's case contains nothing concerning apportionment, and seems merely to stand for the relatively uncontroversial propositions that (1) "[r]eliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty," and that (2) "when considering the amount of a use-based reasonable royalty adequate to compensate for the infringement, a jury may consider . . . the value of the benefit conferred to the infringer by use of the patented technology." *Powell*, 663 F.3d at 1240 (citations omitted). I thus don't think this case says anything about a cost-savings approach to damages not requiring apportionment.

Plaintiff's citation to *TC Tech. LLC v. Sprint Corp.*, 2019 WL 2515779, at *3-4 (D. Del. June 18, 2019) is more on point. In *TC*, at the Daubert stage, I found an expert witness's cost savings analysis "not excludable for failure to apportion damages." *Id.* at *4. I cited an earlier Federal Circuit opinion in support of my conclusion, *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360 (Fed. Cir. 2017), noting that this case stood for the proposition that "damages may be based on cost savings from a defendant's infringement without an independent analysis of the claimed invention's 'footprint in the market place.'" *TC*, 2019 WL 2515779, at *3 (quoting *Prism*, 849 F.3d at 1375-76). In *TC*, however, the expert in question did in fact perform apportionment even while taking a cost savings approach, as Defendants helpfully point out. (D.I. 414 at 7).

> [The expert witness] uses [a methodology] to obtain an initial cost savings range from $7.99 billion to $8.46 billion. He then excludes two-thirds as attributable to "downlink" functionality on the assumption that the '488 patent only relates to "uplink" functionality. He excludes 22% of the remaining one-third as being attributable to the unpatented aspects of uplink. Lastly, he allocates 64% to 74% of what remains to [the defendant], based on how the parties to the hypothetical negotiation would have split the cost savings. The net result is a reasonable royalty range of $540 million to $792 million.

*TC*, 2019 WL 2515779, at *2.

Thus, I don't think *TC* helps Plaintiff's case.

*Prism*, which I cite in *TC*, is more helpful to Plaintiff, but I think that this case is ultimately unavailing. In *Prism*, the Federal Circuit only analyzed "[the defendant's] argu[ment] that the district court erred in admitting [the plaintiff's] principal damages evidence." *Prism*, 849 F.3d at 1375.

> [The defendant] moved for judgment as a matter of law (JMOL) and a new trial. . . . The district court denied those motions. . . . [The defendant] argues that the district court erred in denying its motion for a new trial. Specifically, [the defendant] contends, the court erred by . . . admitting [the plaintiff's] cost-savings damages evidence.

*Id.* at 1366.

In ruling on the defendant's motion for a new trial, the Federal Circuit held:

> Although a patentee must carefully tie proof of damages to the claimed invention's footprint in the market place, that requirement for valuing the patented technology can be met if the patentee adequately shows that the defendant's infringement allowed it to avoid taking a different, more costly course of action. A price for a hypothetical license may appropriately be based on consideration of the costs and availability of non-infringing alternatives and the potential infringer's cost savings.

*Id.* at 1376 (cleaned up).

The Federal Circuit's statements of the laws, however, were made only in the context of whether testimony by the plaintiff's damages experts had been improperly admitted. The *Prism* defendant's argument was not based on a failure of proof because the cost savings evidence had not been apportioned.[12] Therefore, *Prism* stands for, at most, the proposition that cost savings

---

[12] I note that the words "apportionment," "apportion," or any such related words do not appear in the *Prism* opinion. I accept, however, that "footprint in the market place" is a description that is related to the idea of apportionment. *See Allergan, Inc. v. Revance Therapeutics, Inc.*, 789 F. Supp. 3d 365, 383 (D. Del. 2025).

damages evidence is admissible without "t[ying] proof of damages to the claimed invention's footprint in the market place."[13] *Id.* at 1376. The decision does not support the proposition that evidence of cost savings makes the concept of apportionment moot.[14] Therefore, the decision does not mean that the facts of a particular case are irrelevant in determining whether cost savings needs to be apportioned in that case. Plaintiff has not cited any case that would support that proposition.

**D. New Trial**

Defendants move for a new trial, in the event I do not "grant judgment as a matter of law or remit damages to $1.00." (D.I. 397 at 20). Federal Rule 50(c)(1) states,

> If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial.

Defendants argue that a new trial is warranted, because the jury should have been instructed on nominal damages. (D.I. 397 at 24).[15] The jury instructions with which I charged the jury asked that they determine "the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation" (Tr. 759:17-19); this

---

[13] The defendant also argued "that [the plaintiff] did not prove that [the defendant's] leasing costs were an appropriate basis for estimating cost savings," because "leasing costs are unreliable because they also include technological and business-related factors . . . which have nothing to do with [the defendant's] technical requirements." *Prism*, 849 F.3d at 1375-76. The Federal Circuit rejected this challenge.

[14] This result is consistent with two other cases in which I ruled that an expert's report or testimony was not excludable for failure to apportion. *See TC Tech*, 2019 WL 2515779, at *4; *Allergan, Inc.*, 789 F. Supp. 3d at 383. As with *Prism*, neither of these cases touched upon the sufficiency of cost-savings evidence to support a damages award absent evidence of apportionment.

[15] Defendants preserved this argument. (D.I. 351 at 28:22-31:1).

"reasonably royalty . . . must be a royalty that would have resulted from the hypothetical negotiation." (Tr. 760:17-19).

Plaintiff's argument against this point can be characterized as follows:

> [A]n instruction that the jury was permitted to award nominal damages would have been inappropriate, unsupported by any evidence at trial, and contrary to the Patent Act's provision that a patentee is entitled to damages "in no event less than a reasonably royalty." 35 U.S.C. § 284. Indeed, "even if the plaintiff[] has no evidence to proffer"—a situation not present here—the Federal Circuit instructs that the fact finder should "consider the *Georgia-Pacific* factors 'in detail and award such reasonable royalties as the record evidence will support.'" *Info-Hold, Inc. v. Muzak*, 783 F.3d 1365, 1372 (Fed. Cir. 2015). (quoting *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003)).

(D.I. 407 at 25).

First, I note that *Info-Hold* is relatively distinguishable from the facts of this case. The *Info-Hold* court made its finding in the context of reversing the lower court's summary judgment finding, specifically noting, "the exclusion of the patentee's damages evidence is not sufficient to justify granting summary judgment." *Info-Hold*, 783 F.3d at 1372.

Second, I think Plaintiff's argument ignores the law. The Federal Circuit explicitly found in *TecSec*, while interpreting 35 U.S.C. § 284, "The statute does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts." *TecSec*, 978 F.3d at 1291. The Federal Circuit recently reaffirmed this principle in *Rex Medical.*

> [T]he patent damages statute, 35 U.S.C. § 284, does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts. Damages must not be left to conjecture by the jury. They must be proved, and not guessed at. Section 284 requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute. There must at the least be enough evidence in the record to allow the factfinder to formulate a royalty.

*Rex Medical*, 156 F.4th at 1299 (cleaned up).

I have indicated my rationale as to why I think Plaintiff failed to prove apportionment as required. Nevertheless, the jury instructions that I provided made it clear that Plaintiff had to prove damages and that only such damages as Plaintiff proved should be awarded. (D.I. 336 at 14). If the Court of Appeals rejects Defendants' damages arguments and decides there is substantial evidence to support the damages verdict, then I do not believe there would be any reason to grant a new trial.

### E. Enhanced Damages and Prejudgment and Post-judgment Interest

Plaintiff filed a motion for Enhanced Damages and Prejudgment and Post-Judgment and Interest. (D.I. 393). As I granted judgment as a matter of law to Defendants on the issue of damages, Plaintiff is entitled to no damages, and I dismiss Plaintiff's motion as moot. *See TecSec* 978 F.3d at 1291; *Rex Medical*, 156 F.4th at 1298-99.

## IV. CONCLUSION

An appropriate order will issue.